# IN THE SUPREME COURT OF IOWA

No. 13–0588

Filed June 30, 2015

Amended September 30, 2015

**STATE OF IOWA,**

Appellee,

vs.

**HILLARY LEE TYLER,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Webster County, Thomas J. Bice, Judge.

Defendant appeals her conviction for murder in the second degree for the death of her newborn son. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller and Laura Roan, Assistant Attorneys General, and Ricki Osborn and Cori Kuhn Coleman, County Attorneys, for appellee.

Randall D. Armentrout and Ryan G. Koopmans of Nyemaster Goode, P.C., Des Moines, for amicus curiae Iowa Association of County Medical Examiners.

**ZAGER, Justice.**

Hillary Tyler appeals her conviction for murder in the second degree for the death of her newborn son (Baby Tyler). *See* Iowa Code §§ 707.1, .3 (2011). She maintains the district court erred in denying several of her trial motions, including: a motion in limine to exclude a medical examiner's testimony and autopsy report opining to the cause and manner of Baby Tyler's death, a motion to suppress evidence obtained by police during the search of Tyler's hotel room, and a motion to suppress statements Tyler made to police. She also maintains there was insufficient evidence to support her conviction. The court of appeals held the district court abused its discretion in allowing the medical examiner to testify to the cause and manner of Baby Tyler's death and in admitting the unredacted autopsy report into evidence. Accordingly, it reversed the judgment of the district court and remanded the case for a new trial. The court of appeals did not address the remaining issues raised in the appeal.

The State applied for further review, which we granted. On further review, we conclude the district court abused its discretion in allowing the medical examiner to testify to the cause and manner of Baby Tyler's death because the medical examiner based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to the police as opposed to objective, scientific, or medical evidence. For the same reason, the district court should have redacted any reference to cause and manner of death in the autopsy report. Additionally, we conclude the district court erred in denying Tyler's motion to suppress evidence obtained by the police during the search of the hotel room based solely on the legal conclusion that Tyler had no reasonable expectation of privacy in the room because she obtained it for the

purpose of committing a crime. Thus, we reverse this motion and remand the issue for further hearing and ruling by the district court concerning the applicability of exceptions to the warrant requirement or exclusionary rule. We affirm the district court's denial of Tyler's motion to suppress statements she made to police. We vacate the decision of the court of appeals, affirm the judgment of the district court in part and reverse in part, and remand the case for additional proceedings consistent with this opinion and a new trial.

## I. Background Facts and Proceedings.

Tyler and Rodney Cyphers began dating in 2010. In early 2011, Cyphers noticed Tyler was beginning to exhibit signs of pregnancy and asked her if she was pregnant. Tyler denied being pregnant. She told Cyphers she was suffering from a medical condition that caused her to exhibit signs typically associated with pregnancy. Tyler was in fact pregnant. Over time, Tyler exhibited increased signs of pregnancy and began wearing looser fitting clothing. Even so, Tyler continued to deny she was pregnant to anyone who asked and refused to allow Cyphers to touch her abdomen.

In the summer of 2011, Cyphers's employer assigned him to a job at a plant located in Fort Dodge, Iowa. At the end of August, Tyler and Cyphers temporarily relocated to Coalville, Iowa, which is approximately ten miles south of Fort Dodge. While there, Tyler and Cyphers lived in a fifth-wheel trailer in a trailer park.

At approximately 3:00 a.m. on September 19, Tyler began experiencing mild contractions. At approximately 6:30 a.m., she called the Super 8 Hotel in Fort Dodge to inquire about a room. She spoke with the hotel manager who advised her that a room was available. Tyler arrived at the hotel approximately twenty minutes later and checked into

room 225. Tyler occupied room 225 from approximately 6:50 a.m. until 4:30 p.m. At approximately 12:00 p.m., she gave birth to Baby Tyler in the bathroom of room 225. She then "laid around for a little bit" and "cleaned the bathroom floor" before returning to the trailer in Coalville. Cyphers was home when she arrived. Shortly before 7:00 p.m., Cyphers left to work a night shift. Tyler stayed alone at the trailer for the night.

After working the night shift, Cyphers returned to the trailer at approximately 7:15 a.m. on September 20. Tyler was present when he arrived. The couple ate breakfast and ran a few errands before returning to the trailer so that Cyphers could sleep. At approximately 10:15 a.m., Tyler returned to the hotel to check out of room 225. Upon Tyler's arrival, the hotel manager informed Tyler there had been a cancellation and room 225 was available for an additional night. Another member of the hotel staff had previously informed Tyler room 225 was not available for an additional night. Tyler rented room 225 for the night of September 20. Shortly thereafter, she left the hotel and returned to the trailer in Coalville. She intended to return to the room later that evening to clean it further.

At approximately 11:00 a.m., a housekeeper at the hotel entered room 225 to clean it. Because Tyler had not rerented the room until late that morning, the sheet informing the housekeeper of the room's rental status had not been updated to reflect that the room was a "stayover" as opposed to a "checkout." The doorknob to the room had a "Do Not Disturb" sign hanging from it. Upon entering the room, the housekeeper observed the carpet was saturated with blood. Upon entering the bathroom, she further discovered "a lot of blood smear[ed] . . . on the floor." The housekeeper then exited the bathroom and discovered a "hoodie coat." She picked it up and observed the inside of the coat was

saturated with blood. Additionally, she observed two discarded vodka bottles and "$8 . . . on the dresser by the TV," which she thought was a tip. She also observed a garbage can in the room, which contained a "white towel bundled up" among other trash. She "slid the garbage can" across the room and discovered it was "heavy." She did not empty the garbage can or further examine its contents. In a panicked state, she left the room and reported her findings to the hotel manager. The manager and the housekeeper returned to the room. Another housekeeper also entered the room "because she could tell there was something going on in the room." The other housekeeper "pulled the can liner out of the garbage can" and the group observed the towel in the garbage can had some blood on it and the bottom of the garbage bag contained "fluid and some blood." Although they did not see Baby Tyler's body, they were very concerned about the contents of the garbage can. The manager then called the police to report these findings.

Police were dispatched to the hotel at approximately 11:36 a.m. According to the responding officer, the original complaint "was for . . . criminal mischief . . . or . . . vandalism[,] . . . so that's what [he] was thinking going into it." Upon arrival at the hotel, the responding officer spoke with the hotel manager who advised him what the hotel staff had observed. Accompanied by hotel staff, the officer entered room 225 to investigate. Thereafter, he contacted his supervisor who arrived within approximately ten minutes. Over the next twenty to fifty minutes, the officers looked around the room as several additional officers arrived at the scene. In the course of their investigation, officers observed that, in addition to the blood, there appeared to be other bodily fluids present in the room. Eventually, one of the officers moved the towel and other items in the garbage can. Beneath these items, he discovered Baby

Tyler's body. At that point, it "didn't appear that there was any need to render any aid," so the officers secured the room until they could obtain a search warrant.

After officers discovered Baby Tyler's body, Fort Dodge police contacted the Iowa Division of Criminal Investigation (DCI). Detectives from the Fort Dodge Police Department, in cooperation with the DCI, were subsequently able to identify and locate Tyler. At approximately 2:08 p.m., Special Agent Michael Roehrkasse of the DCI, Special Agent Ray Fiedler of the DCI, and Detective Jody Chansler of the Fort Dodge Police Department went to the trailer in Coalville.[1] The officers were dressed in plain clothes as opposed to police uniforms. The officers approached the trailer and knocked on the door. Tyler answered. The officers' encounter with Tyler was audio recorded.

After making contact with Tyler, the officers told her they needed to speak with her. She told them she understood that she needed to speak with them. Detective Chansler asked Tyler if she needed any medical attention. She replied, "No." He then stated, "I want to have you go with this guy right here," and pointed to Special Agent Roehrkasse. He further stated, "We need to get to the bottom of what's going on." He then asked Tyler, "Are you okay with that?" Tyler responded, "Yea."

Tyler followed the officers to Special Agent Roehrkasse's vehicle and entered it. Outside of Tyler's presence, the officers discussed how Special Agent Roehrkasse should ask Tyler if the baby was born alive. Special Agent Roehrkasse then entered the vehicle and proceeded to drive to the Fort Dodge police station. He did not read Tyler her *Miranda* rights at this time. During the ride, Special Agent Roehrkasse asked

---

[1]We will refer to the special agents of the DCI and the officers of the Fort Dodge Police Department as "officers" when referred to collectively.

Tyler if the baby had moved. She responded, "No." He also asked her if the baby had cried. She responded, "No." Special Agent Roehrkasse and Tyler did not discuss anything else of significance during the ride to the police station.

After arriving at the police station, Tyler was escorted to an interview room in the basement. Thereafter, Special Agent Roehrkasse, along with Special Agent Jim Thiele of the DCI, questioned Tyler over a period of approximately three hours. The interview was video recorded. Both officers were wearing guns on their hips. During the interview, the door to the room was closed; however, it was unlocked and Tyler's path to it was unobstructed.

Special Agent Roehrkasse began the interview by asking Tyler if she needed any medical attention. She responded, "No." He then informed her that although she had ridden with him to the police station, she was free to leave at any time. He also informed her that if she desired, he would drive her back to the trailer. He told her that although the door was shut, that should not deter her from leaving. During the interview, the special agents again reminded Tyler she was not in custody and was free to leave. The special agents twice suggested that Tyler seek medical treatment.

During the first half of the interview, the special agents asked Tyler open-ended questions about her background and the events surrounding Baby Tyler's birth. During this period, Tyler told the special agents that after Baby Tyler was born he was silent, he did not move, and she immediately placed him in the garbage can. After approximately forty-five minutes, the special agents took a forty-three minute break. Before they left the room, Special Agent Thiele reminded Tyler the door was unlocked and informed her that she was free to "get up and roam

around" if she wanted. After the break, Special Agent Roehrkasse returned alone, began asking Tyler more pointed questions about the birth, and posited several hypothetical questions about what the autopsy would show. Tyler eventually stated that after Baby Tyler was born he moved and cried and she placed him in the bathtub and turned the water on for the purpose of drowning him. Special Agent Roehrkasse then took another thirty-minute break before returning to ask Tyler several follow-up questions. Special Agent Roehrkasse then took another fifteen-minute break. Upon his return, he informed Tyler she would be "charged today" and read Tyler her *Miranda* rights. After waiving her *Miranda* rights by signing a written waiver form, Special Agent Roehrkasse reviewed Tyler's statements with her. Tyler confirmed that after Baby Tyler was born he moved and cried and she placed him in the bathtub and turned on the water for the purpose of drowning him. At the conclusion of the interview, the special agents took Tyler to the hospital for medical treatment.

Although the exact time is not clear from the record, officers filed an application for search warrant after they completed the interview at the police station. Through the warrant application, officers sought authorization to search for and seize items from room 225, a pickup truck registered to Cyphers, and the trailer in Coalville. Officers also sought to obtain DNA samples from both Tyler and Cyphers for analysis. In the warrant application, Detective Cory Husske wrote that at approximately 11:00 a.m. the Super 8 cleaning staff "found . . . room [225] in disarray," "saw what looked like blood in multiple locations around the room and bathroom," "observed a garbage can in the room containing towels soaked in blood and female menstruation pads," noticed the garbage can "had a heav[y] weight about it," and contacted

police. The warrant application noted that after officers confirmed the information provided by the hotel staff and found Baby Tyler's body in the garbage can, they decided to "get as much information extracted from [the] room as [was] possible through the use of a search warrant." The warrant application explained the officers then sought to locate Tyler and, in cooperation with the DCI, were successful in doing so. Finally, the warrant application noted that officers had "obtained audio/video recorded statements from [Tyler] in which she . . . admitted to giving birth to a baby and discarding it." Officers subsequently seized a number of items from room 225, including Baby Tyler's body and a piece of the umbilical cord. Officers also seized a number of items from the trailer in Coalville, including the placenta.

After Tyler arrived at the hospital on September 20, Dr. Daniel Cole treated her and ordered several lab tests. He testified at the suppression hearing and at trial that Tyler was alert and aware of her surroundings when he was treating her. Thereafter, Tyler received surgical repair for a tear from childbirth. She had lost a large amount of blood and her blood pressure was high. She received a blood transfusion and several medications.[2] Tyler was also suffering from a condition called preeclampsia. This is a condition that occurs in pregnancy and causes the patient to become hypersensitive and leads to increased blood pressure.

---

[2]Some of the medications Tyler received include Labetol, magnesium sulfate, and codeine. At the suppression hearing, Dr. Cole testified that Labetol is used to treat high blood pressure, magnesium sulfate is used to treat high blood pressure in pregnancy, and codeine is a narcotic. He testified that because Tyler was taking several medications to reduce high blood pressure, it was possible these medications caused her blood pressure to drop too low, which could potentially affect her mental status. Additionally, he testified that codeine could affect a person's mental status if given in a "high enough dose." However, no evidence was presented suggesting these medications in fact affected Tyler's mental status.

The next day, September 21, Special Agent Roehrkasse and Special Agent in Charge Larry Hedlund of the DCI went to Tyler's hospital room to question Tyler again. This interview was audio recorded and lasted for approximately fifty minutes. At the start of the interview, Special Agent in Charge Hedlund read Tyler her *Miranda* rights. "[H]e went through each of [her rights] and had her explain what each of the rights meant to her." Tyler explained each of her rights back to the special agents in her own words. She acknowledged that she understood her rights and signed another written waiver form. Tyler told the special agents she was "really out of it." However, she remembered speaking with Special Agent Roehrkasse the previous day and that his name was "Mike." She also knew that she was at the hospital.[3] Additionally, when the special agents asked Tyler if she would prefer "[they] come back later," Tyler responded, "You can talk to me." The special agents told Tyler that if she got too tired or upset, they would stop the questioning. During the questioning Tyler never appeared confused and was alert and tracking with the special agents' questions. During this follow-up interview, Tyler again stated that after Baby Tyler was born he moved and cried and she placed him in the bathtub and turned on the water for the purpose of drowning him.

Baby Tyler's body, a piece of the umbilical cord, and the placenta were taken to the offices of the State Medical Examiner. Thereafter, Dr. Jonathan Thompson, an Associate State Medical Examiner trained in the field of forensic pathology, performed an autopsy on Baby Tyler's body and a pathology examination on the body and related items. Dr.

---

[3]A psychiatric evaluation conducted on September 21 stated that at the time of the examination, Tyler was oriented to time and place.

Thompson subsequently issued a "Report of Autopsy" summarizing his findings.

After performing the autopsy and pathology examination, Dr. Thompson's opinions on both the cause and manner of Baby Tyler's death were "Undetermined." In his final report, however, Dr. Thompson concluded the cause of death was "Bathtub drowning" and the manner of death was "Homicide." His final report indicated that in reaching these conclusions he performed both an external and internal examination of Baby Tyler's body. His report further indicated that in forming his opinions he relied on Tyler's statements to police. The report stated: "The mother claimed she had given birth the previous day in the motel room and then placed the infant in a bathtub partially filled with water shortly after the birth. The baby reportedly moved and cried after birth."

Based on Tyler's statements to police and other evidence obtained during the investigation, the State charged Tyler with murder in the first degree for the death of Baby Tyler on September 28. *See* Iowa Code §§ 707.1, .2(1), .2(5). Tyler entered a plea of not guilty.

Prior to trial, Tyler filed several motions relevant to this appeal, including: a motion in limine to exclude Dr. Thompson's testimony and autopsy report opining to the cause and manner of Baby Tyler's death; a motion to suppress evidence obtained by police during the search of room 225 in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution; and a motion to suppress Tyler's statements to police in violation of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Iowa Constitution.

After hearings on the motions, the district court denied both of Tyler's motions to suppress. On the motion to suppress evidence

obtained by police during the search of room 225, the district court concluded Tyler did not have a reasonable expectation of privacy in the room because she had not intended to use the room as a residence, but instead as a venue for the commission of an alleged crime. Thus, the district court concluded Tyler's Fourth Amendment rights were not implicated. On the motion to suppress Tyler's statements to police, the district court concluded Tyler was not in custody at the trailer, during the ride to the police station, or during the questioning at the police station on September 20. As a result, the district court concluded her Fifth Amendment rights were not violated. The district court also concluded the special agents' follow-up questioning of Tyler at the hospital did not violate her rights because the special agents informed her of her *Miranda* rights and she executed a knowing, intelligent, and voluntary waiver.

On January 15, 2013, the district court held a hearing on Tyler's motion in limine to address the admissibility of Dr. Thompson's expert opinion on the cause and manner of Baby Tyler's death. Tyler's motion requested that the district court "prohibit[] the State . . . from soliciting or introducing any evidence from [Dr. Thompson] on his conclusions of the truthfulness of [Tyler's] statements that were provided to him by law enforcement." Tyler maintained this evidence impermissibly "passe[d] on [her] guilt or innocence" and constituted an improper comment on her credibility. Tyler's motion also requested that the district court "prohibit[] the State . . . from soliciting or introducing any evidence from [Dr. Thompson] as to scientific or medical opinions on the cause or manner of death." Tyler maintained Dr. Thompson's opinion on these matters "would not be based on any scientific or medical knowledge,

scientific standards, or technical training, but merely from the witness adopting the statements and conclusions of law enforcement."

At the hearing, Tyler's counsel questioned Dr. Thompson about the autopsy he performed and the foundation for his conclusions of the cause and manner of Baby Tyler's death. The following exchange occurred:

> Q. Okay. So the examination includes your visual examination, both inside and outside of the body that you're examining, correct? A. Yes, sir.
>
> Q. And then it also includes various . . . scientific tests? A. Yes, it does.
>
> . . . .
>
> Q. In this case, if you based your opinions speaking strictly on medical or scientific evidence, you were unable to give a conclusion as to whether or not this was a homicide, correct? A. Just on the autopsy findings, that would be correct, yes.
>
> Q. Okay. And also based just on the autopsy findings, you would be unable to determine whether or not this was a drowning, correct? A. That would be correct, yes.
>
> Q. The autopsy findings were consistent with intrauterine fetal demise,[4] correct? A. They could be, yes.
>
> Q. They could also be consistent with a baby that died immediately after birth, correct? A. It could be, yes.
>
> . . . .
>
> Q. Okay. So the specific autopsy, the testing that you did, the toxicology test, the examination of the lungs, all of the things you did, the examination of the stomach contents, all of that led you to an inconclusive determination, correct? A. That's correct, yes.
>
> Q. And the only way that you reached the conclusion of homicide as the manner of death, as drowning as a cause of death, is through observing and watching the videotapes that the law enforcement officers supplied to you, correct? A. Yes, it is.
>
> Q. So that would be of Miss Tyler's interview with the police, correct? A. That's correct.[5]

_____

[4]Intrauterine fetal demise, commonly referred to as a "stillbirth," occurs when a fetus dies in utero.

. . . .

Q. Okay. So from that standpoint, ultimately your opinion as to whether or not this was a homicide . . . and what the cause of death was, is based entirely on your belief of her statements, correct? A. That's correct, yes.

. . . .

Q. Okay. . . . [E]ssentially what you're saying is that since the autopsy didn't disprove her statement, you're going to believe her statement? A. That's correct, yes. There's nothing inconsistent between what she said and what I saw at the autopsy.

Q. Hypothetically speaking, if her statement to the police was the baby was a stillborn, your conclusion then would have had to have been stillborn birth, natural cause of death, correct? A. . . . I would probably classify as [stillbirth].

. . . .

Q. And that's just because the actual medical examination, medical testing, scientific testing is inconclusive? A. That's correct, yes.

The district court overruled Tyler's motion in limine. In its ruling, it noted that "in Iowa, the courts are committed to a liberal rule on the admission of expert testimony" and that Dr. Thompson's reliance on Tyler's statements to police was "no different than a physician relying on a patient's history in reaching a diagnosis." Consequently, the district court overruled Tyler's motion in limine, "subject to [her] right to vigorously and thoroughly cross-examine" Dr. Thompson.

Trial in this matter commenced on February 11. The central issue in the case was the cause of Baby Tyler's death. Specifically, whether Baby Tyler was born alive and survived for a sufficient period for Tyler to drown him, or whether he was stillborn or died immediately after birth

_____

[5]Based on the record, it is unclear whether Dr. Thompson listened to the audio recording of the ride from the trailer to the police station. Testimony given by Dr. Thompson at a deposition taken prior to the hearing on the motion in limine, at the hearing on the motion in limine, and at trial confirms that he both viewed the video of the interview at the police station and listened to the audio recording of the follow-up interview at the hospital.

such that Tyler could not drown him. The State presented, among other evidence, testimony from Cyphers, members of the hotel staff, officers who investigated room 225, and the special agents who interviewed Tyler. The State also presented Tyler's interviews at both the police station and the hospital by way of video and audio recordings, respectively.[6]

Dr. Thompson also testified on behalf of the State. On direct examination, he explained to the jury that the autopsy he conducted on Baby Tyler involved both an external and internal examination of the body. He explained that he found fluid in Baby Tyler's lungs. However, he also explained that this fluid was, at least in part, amniotic fluid. Dr. Thompson testified that because amniotic fluid is in part composed of water, there was no scientific basis for determining whether some of the fluid was bathwater. Dr. Thompson further testified that there were indications Baby Tyler may have taken a breath because the alveoli in the lungs were partially, although not entirely, expanded. He then testified that based on this finding, and "[g]iven the history that Baby Tyler cried and moved, . . . Baby Tyler probably took a few breaths." Dr. Thompson further testified that based on his findings, he was able to rule out several possible alternative causes of death. He then opined that Baby Tyler's cause of death was "drowning," and that his manner of death was "homicide"—meaning "death at the hands of another individual." Finally, Dr. Thompson testified that his opinions on the cause and manner of Baby Tyler's death were based on "a combination of history, which includes scene findings, it includes witness statements; it's also based on a combination of physical exam, which is [the] autopsy findings; and then supplemental testing."

---

[6]The jury did not listen to the audio recording of the officers' initial contact with Tyler or the ride from the trailer to the police station.

On cross-examination, defense counsel called attention to the inconclusive nature of Dr. Thompson's autopsy findings. Counsel asked Dr. Thompson if there was an alternative explanation for the partially expanded alveoli in Baby Tyler's lungs. Dr. Thompson explained that partially expanded alveoli would also be consistent with the production of methane gas by bacteria found in the body after death, which "will diffuse up into the lungs and can expand those a[l]veolar spaces." Counsel also questioned Dr. Thompson as to whether it was possible, based on the autopsy, that Baby Tyler was stillborn or died immediately after birth. Dr. Thompson testified there were several other possible causes of death he could not rule out based on the autopsy findings alone. He agreed with defense counsel that it was possible Baby Tyler died either in utero or immediately after birth. Defense counsel and Dr. Thompson also had an exchange in which counsel pressed Dr. Thompson on the basis for his conclusion of the cause and manner of Baby Tyler's death. The following exchange occurred:

> Q. Okay. It is true that you cannot say from your autopsy alone that the child in this case ever took a breath, correct? A. That's correct, yes.

> Q. . . . For that opinion, you are entirely relying on the review of the interview in this case; is that correct? A. Uh, not necessarily, because there's nothing inconsistent with what the witness statement said with the autopsy findings.

> Q. Well -- A. But without the witness statements, I could not have diagnosed drowning in this case.

> Q. You had conducted your autopsy, correct? A. Yes.

> Q. Your opinion was undetermined at that time? A. That's correct, yes.

> Q. And then the only way you came up with your decision in this case was based on the interview you watched? A. Yes, sir, that's correct.

> Q. Now, you're relying on the fact that [Tyler] said prior to putting the baby in the tub, the baby moved and cried, correct? A. Yes, sir.

Tyler's defense was that her statements to police were not credible and the product of coercion. Counsel noted that during the first half of the interview at the police station, Tyler denied the baby cried or moved after the birth. It was only after being interviewed for forty-five minutes and a forty-three minute break that Tyler stated the baby cried and moved. Tyler maintained these statements were not credible due to the length of the interview and her need for medical care. As to her second interview at the hospital, Tyler's defense was that these statements were also not credible due to her medicated and vulnerable state. Tyler also presented a medical expert who testified in her defense. This pathologist testified that there was not sufficient information to determine the cause or manner of death.

The jury found Tyler guilty of the lesser included offense of murder in the second degree. *See* Iowa Code §§ 707.1, .3. Tyler appealed and we transferred the case to the court of appeals. The court of appeals held the district court abused its discretion in allowing Dr. Thompson to testify to the cause and manner of Baby Tyler's death and in admitting the unredacted autopsy report into evidence. The court of appeals reasoned Dr. Thompson's reliance on Tyler's statements in forming his opinions on the cause and manner of death amounted to an improper comment on Tyler's credibility. It also concluded Dr. Thompson's opinions could not fairly be characterized as expert medical opinions. The court of appeals further determined the erroneous admission of Dr. Thompson's testimony and autopsy report into evidence was reversible error because Tyler's credibility was the central issue in the case. The court of appeals reversed the conviction and remanded the case for a new trial. It did not address the remaining issues raised in the appeal.

The State applied for further review, which we granted. We will provide additional facts in the discussion of specific issues below.

## II. Standard of Review.

Evidentiary rulings are reviewed for an abuse of discretion. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). " 'An abuse of discretion occurs "when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." ' " *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014) (quoting *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012)). " 'A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.' " *State v. Redmond*, 803 N.W.2d 112, 117 (Iowa 2011) (quoting *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000)). "Thus, under our abuse-of-discretion standard, 'we will correct an erroneous application of the law.' " *Miller*, 841 N.W.2d at 586 (quoting *Rowedder*, 814 N.W.2d at 589). " ' "When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." ' " *Id.* (quoting *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010)).

We review determinations of whether to suppress both evidence obtained and statements made in violation of constitutional guarantees de novo. *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011); *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010). "[W]e make ' "an independent evaluation of the totality of the circumstances as shown by the entire record," ' " considering "both the evidence introduced at the suppression hearing as well as the evidence introduced at trial." *Palmer*, 791 N.W.2d at 844 (quoting *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001)); *see*

*also Watts*, 801 N.W.2d at 850. " 'We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings.' " *Palmer*, 791 N.W.2d at 844 (quoting *Turner,* 630 N.W.2d at 606). In considering whether a defendant's statements were voluntarily given, we give considerable weight to the district court's findings. *State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992). When the alleged error concerns the erroneous admission of evidence in violation of a defendant's constitutional rights, such error is typically subject to harmless-error analysis. *See State v. Peterson*, 663 N.W.2d 417, 430 (Iowa 2003).

### III. Discussion of Medical Examiner Testimony.

In our analysis of this case, we must determine when medical examiners may rely on witness statements and the results of police investigations, in addition to their medical examination and findings, in forming their opinions on cause or manner of death. We begin by setting forth the role of expert testimony within our system of justice. Next, we consider the duties and responsibilities of our state medical examiners. We then consider whether medical examiners may rely on witness statements and information obtained through police investigations in forming their opinions on cause or manner of death. Finally, we consider whether under the unique circumstances of this case, it was appropriate for Dr. Thompson to opine on the cause and manner of Baby Tyler's death.

**A. The Role of Expert Testimony in Iowa.** Iowa is generally "committed to a liberal view on the admissibility of expert testimony." *Ranes v. Adams Labs., Inc.,* 778 N.W.2d 677, 685 (Iowa 2010). Iowa Rule of Evidence 5.702 allows expert opinion testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue." Iowa Rule of Evidence 5.703 provides further insight into the information experts may rely on in forming their opinions. This rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Iowa R. Evid. 5.703.

"[T]here is no requirement that the expert be able to express an opinion with absolute certainty. A lack of absolute certainty goes to the weight of the expert's testimony, not to its admissibility." *Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 637 (Iowa 1997) (citation omitted). In the context of cause of death determinations, in order to be considered by the trier of fact " 'it is only necessary that the witness entertain a "reasonable degree of medical certainty" for his conclusions.' " *State v. Webb*, 309 N.W.2d 404, 413 (Iowa 1981) (quoting *Commonwealth v. Stoltzfus*, 337 A.2d 873, 879 (Pa. 1975)). " ' "Whether the . . . evidence is sufficient to warrant a finding of causal connection is initially a legal question for the court, but whether it is persuasive beyond a reasonable doubt is for the jury to say." ' " *Id.* at 413–14 (quoting *Stoltzfus*, 337 A.2d at 879).

"[O]therwise admissible [opinion testimony] is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Iowa R. Evid. 5.704. However, an expert may not opine as to whether a particular legal standard has been satisfied or to "the defendant's guilt or innocence." *State v. Smith*, 522 N.W.2d 591, 593–94 (Iowa 1994). Further, we have continually held that expert testimony is not admissible merely to bolster a witness's credibility. *See State v. Dudley*, 856 N.W.2d

668, 676 (Iowa 2014) ("[W]e continue to hold expert testimony is not admissible merely to bolster credibility."); *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986) ("[M]ost courts reject expert testimony that either directly or indirectly renders an opinion on the credibility or truthfulness of a witness."). As we recently explained with respect to this rule:

> Our system of justice vests the jury with the function of evaluating a witness's credibility. The reason for not allowing this testimony is that a witness's credibility "is not a 'fact in issue' subject to expert opinion." Such opinions not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence. Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth. In our system of justice, it is the jury's function to determine the credibility of a witness. An abuse of discretion occurs when a court allows such testimony.

*Dudley*, 856 N.W.2d at 676–77 (citations omitted) (quoting *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992)). Notwithstanding, "[w]e recognize there is a very thin line between testimony that assists the jury in reaching its verdict and testimony that conveys to the jury that [a witness's] out-of-court statements and testimony are credible." *Id.* at 677.

**B. The Role of the Medical Examiner.** A state medical examiner must be "a physician and surgeon or osteopathic physician and surgeon, . . . licensed to practice medicine in the state of Iowa, and . . . board certified or eligible to be board certified in anatomic and forensic pathology by the American board of pathology." Iowa Code § 691.5. Forensic pathologists are physicians who specialize in forensic pathology, meaning they received a Doctor of Medicine or a Doctor of Osteopathy, spent at least four years in a residency program, and then spent another

year in a forensic pathology fellowship. *See* Iowa Code § 331.801(2) (outlining requirements to serve as a county medical examiner); *id.* § 691.5 (outlining requirements to serve as a state medical examiner); David Dolinak et al., *Forensic Pathology: Principles and Practice,* at xxiii (Mark Listewnik et al. eds., 2005) [hereinafter Dolinak] (outlining qualifications of forensic pathologists). In certain cases, state law requires medical examiners to investigate the cause and manner of a death, conduct an autopsy, and prepare a written report of their findings. *See* Iowa Code § 331.802(2)(*a*) (requiring county medical examiners to "conduct a preliminary investigation of the cause and manner of death [and] prepare a written report of the findings" when "a person's death affects the public interest"); *id.* § 691.6(7)–(8) (requiring the state medical examiner to "perform an autopsy or order that an autopsy be performed" if required by law and to "retain tissues, organs, and bodily fluids as necessary to determine the cause and manner of death"); Iowa Admin. Code r. 641—127.3(1), (5) (requiring county medical examiners to "perform an autopsy or order that an autopsy be performed" in specified cases and submit a "complete record of the findings of the autopsy . . . to the state medical examiner's office").

The administrative code defines "*Cause of death*" as "the disease or injury which sets in motion the chain of events which eventually result in the death of a person." Iowa Admin. Code r. 641—127.1. The administrative code defines "*Manner of death*" as "the circumstances under which the cause of death occurred." *Id.* The manner of death "may be specified as . . . natural, accident, suicide, homicide, undetermined, or pending." *Id.* In this context, and as explained by Dr. Thompson at trial, the term "homicide" means "[t]he killing of one human being by . . . another." *Black's Law Dictionary* 734 (6th ed. 1990). The

term "homicide" expresses no opinion as to the criminality of the killing or the culpability of the killer.[7] *See id.*

In making cause and manner of death determinations, medical examiners conduct an autopsy, defined as "the external and internal postmortem examination of a deceased person." Iowa Admin. Code r. 641—127.1; *see* Iowa Code § 691.6(7); Iowa Admin. Code r. 641—127.3(1). Further, in making these determinations, medical examiners routinely rely on the circumstances that surround the death, as revealed by independent investigation, police investigation, and eyewitness accounts. *See* Iowa Code § 691.6(5) ("The duties of the state medical examiner shall be: To conduct an inquiry, investigation, or hearing and administer oaths and receive testimony under oath relative to the matter of inquiry, investigation, or hearing, and to subpoena witnesses and require the production of records, papers, and documents pertinent to the death investigation."); Dolinak at 4 ("Before the autopsy is interpreted, circumstances prior to death must be considered."); Michael J. Shkrum & David A. Ramsay, *Forensic Pathology of Trauma: Common*

---

[7]As Black's Law Dictionary explains:

> Homicide is not necessarily a crime. It is a necessary ingredient of the crimes of murder and manslaughter, but there are other cases in which homicide may be committed without criminal intent and without criminal consequences, as, where it is done in the lawful execution of a judicial sentence, in self-defense, or as the only possible means of arresting an escaping felon.

*Black's Law Dictionary* at 734. Our statutes reflect this same concept. *See, e.g.*, Iowa Code § 707.1 (defining murder as "kill[ing] another person *with malice aforethought*" (emphasis added)); *id.* § 707.5(1)–(2) (defining involuntary manslaughter as "unintentionally caus[ing] the death of another person *by the commission of a public offense other than a forcible felony or escape* [or] . . . *by the commission* of *an act in a manner likely to cause death or serious injury*" (emphasis added)); *id.* § 707.6A(1) (defining homicide by vehicle as "unintentionally caus[ing] the death of another by operating a motor vehicle *while intoxicated*" (emphasis added)).

*Problems for the Pathologist* 2 (2007) ("A complete autopsy requires the integration of information from various investigative sources . . . .").

**C. Reliance on Witness Statements and Information Obtained Through Police Investigation.** Whether a medical examiner may opine on cause or manner of death when his or her opinions are based largely on uncorroborated witness statements or information obtained through police investigation is an issue of first impression in Iowa. Other jurisdictions that have considered the issue have failed to reach a consensus. *State v. Sosnowicz*, 270 P.3d 917, 923–24 (Ariz. Ct. App. 2012) (collecting cases and noting that "[t]o the extent that there is a common thread amongst these cases, it is that the admissibility in a criminal case of a medical examiner's opinion regarding the manner of death depends on the particular facts and circumstances of each case"). We turn now to survey the authority on the issue.

As discussed above, expert opinion testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. Thus, we must determine whether a medical examiner's opinion on cause or manner of death assists the trier of fact. Clearly, such opinions can assist the trier of fact in certain circumstances. Specifically, a medical examiner's opinion on cause or manner of death can help the jury determine whether the medical and scientific evidence is consistent with a particular view of the evidence. *See State v. Dao Xiong*, 829 N.W.2d 391, 397 (Minn. 2013) (noting that medical examiner's opinion that the victim's manner of death was homicide "assisted the jury's understanding of the medical evidence offered at trial by explaining that the autopsy results were consistent with homicide").

Notwithstanding, when a medical examiner over-relies on witness statements or information obtained through police investigation in forming his or her opinions on cause or manner of death, such opinions may not assist the trier of fact. Numerous jurisdictions have held that when a medical examiner bases his or her opinions on cause or manner of death largely on statements of lay witnesses or information obtained through police investigation, such opinions are inadmissible under rules similar to our rule 5.702. Iowa R. Evid. 5.702; *see, e.g., Sosnowicz*, 270 P.3d at 922 (noting that "it does not appear that [the medical examiner] relied on any 'specialized knowledge' to classify the death as a 'homicide' rather than an 'accident'" when the medical examiner "based his conclusion that the death was a homicide on the circumstances reported to him by the police"); *Maxwell v. State*, 414 S.E.2d 470, 473–74 (Ga. 1992) (holding "[t]he medical examiner should not have been permitted to testify as to his conclusion or opinion of the manner of death" when "his opinion that the manner of death was due to homicide was based entirely upon the circumstances surrounding [the victim's] demise as related to him by a detective working on the case" because "his expertise as a forensic pathologist was not needed or used in reaching that conclusion"), *overruled on other grounds by Wall v. State*, 500 S.E.2d 904, 907 (Ga. 1998); *People v. Perry*, 593 N.E.2d 712, 716 (Ill. App. Ct. 1992) (noting "[the pathologist's] opinion as to homicide, caused by the defendant's body being positioned on top of her sleeping son, did not in any way add to the evidence already presented to the jury or assist them in reaching their own conclusions," but upholding the conviction because error was harmless); *State v. Vining*, 645 A.2d 20, 20–21 (Me. 1994) (concluding "the medical examiner's opinion that [the victim's] death was a homicide was not a product of her expertise" and "amounted

to an assessment of the credibility and investigatory acumen of the police" when "[she] conceded that there was no physical evidence that [the victim's] death had been caused by a human agent as opposed to an accidental fall"); *State v. Jamerson*, 708 A.2d 1183, 1189, 1195 (N.J. 1998) (holding a forensic pathologist's opinion that a car crash was a homicide as opposed to an accident was inadmissible because his opinion was based on "circumstances leading up to the accident that were within the understanding of the average juror," such that his opinion "could not be of assistance to the jury"); *People v. Eberle*, 697 N.Y.S.2d 218, 219 (App. Div. 1999) (holding a medical expert's opinion that an infant's death was caused by "homicidal suffocation" as opposed to sudden infant death syndrome was inadmissible when "the results of the autopsy equally supported two possible causes of death" because her opinion was not based on the medical evidence, but rather on her review of "statements by defendant and other individuals" (internal quotation marks omitted)); *Bond v. Commonwealth*, 311 S.E.2d 769, 772 (Va. 1984) ("The ultimate question was whether the decedent jumped intentionally, fell accidentally, or was thrown to her death. The facts and circumstances shown by the testimony of lay witnesses were sufficient to enable a jury to decide that question. The expert's opinion was based largely, if not entirely, upon the same facts and circumstances."). These cases generally stand for the proposition that when a medical examiner's opinion on cause or manner of death is based largely on statements of lay witnesses or information obtained through police investigation, such opinions are not sufficiently based on scientific, technical, or specialized knowledge that would assist the jury in weighing the evidence.

For example, in *Sosnowicz*, the defendant was accused of running over the victim with his Hummer. 270 P.3d at 919. At trial, the medical

examiner testified that based on his autopsy of the victim's body, the cause of death was "blunt force trauma." *Id.* at 921. He also testified that based on the autopsy and information he received from police regarding the circumstances surrounding the victim's death, the manner of death was "homicide." *Id.* He explained that in reaching his conclusion on the manner of death he determined the circumstances of the victim's death as reported to him by police were consistent with his autopsy findings and that those circumstances were consistent with homicide. *Id.*

In concluding the medical examiner's testimony was inadmissible under Arizona Rule of Evidence 702, the Court of Appeals of Arizona reasoned:

> [I]t does not appear that [the medical examiner] relied on any "specialized knowledge" to classify the death as a "homicide" rather than an "accident." Under cross-examination, [he] agreed with defense counsel that he based his conclusion that the death was a homicide on the circumstances reported to him by the police. Indeed, [he] was in no better position to determine the manner of death than was the jury who heard the actual trial testimony of witnesses and had the opportunity to evaluate their credibility.

*Id.* at 922–23.

In *Vining*, the victim "died after falling over backwards and hitting his head on a cement floor." 645 A.2d at 20. The victim was intoxicated at the time. *Id.* At trial, an eyewitness who was also intoxicated at the time of the incident testified that the defendant and the victim were in a fight at the time of the fall and that the defendant was standing in front of the victim when the victim fell. *Id.* However, the eyewitness did not actually see the defendant push the victim. *Id.* "The State Medical Examiner testified that although there was no physical evidence from [the victim's] body that would allow her to determine whether [the victim]

fell or was pushed, she concluded based on her conversations with the police investigators that [the victim's] death was a homicide." *Id.*

In concluding the medical examiner's opinion that the victim's death was a homicide was inadmissible, the Supreme Court of Maine reasoned:

> [T]he medical examiner's opinion . . . was not a product of her expertise. The medical examiner conceded that there was no physical evidence that [the victim's] death had been caused by a human agent as opposed to an accidental fall. Her opinion was based solely on her discussions with the police investigators and therefore amounted to an assessment of the credibility and investigatory acumen of the police. The credibility of witnesses is the exclusive province of the jury.
>
> . . . [T]he State argues that "[the medical examiner's] opinion assisted the jury in determining whether [the victim's] fatal injuries resulted from accidentally falling backwards off his chair onto the floor or from the severe force applied by another person." That argument begs the issue. It is appropriate for the medical examiner to testify, as she did, that the damage to the skull shows that severe force was applied. It is another thing entirely, however, to testify that although the physical evidence was insufficient for her to distinguish whether [the victim] fell or was pushed, the police investigators have convinced her that [the victim's] death was a homicide. That is not an expert medical opinion.

*Id.* at 20–21 (footnote omitted)(citation omitted).

In *Eberle*, a case closely analogous to the present case, a medical examiner testified that an infant victim's cause of death was "homicidal suffocation." 697 N.Y.S.2d at 219 (internal quotation marks omitted). However, she admitted "there were no medical findings to explain the death of the infant" and that "the results of the autopsy equally supported two possible causes of death, i.e., suffocation and Sudden Infant Death Syndrome (SIDS)." *Id.* Additionally, she stated that "her opinion that the death was caused by homicidal suffocation rather than

SIDS was not based on medical evidence but rather . . . on her review of statements by defendant and other individuals." *Id.*

In concluding the medical examiner's opinion concerning cause and manner of death was inadmissible, the Supreme Court, Appellate Division, of New York reasoned:

> [T]he opinion of the . . . expert was not based on professional or medical knowledge but rather was based on inferences and conclusions drawn from various statements presented to her by the police. It is, however, for the jury to determine whether to credit such statements and to determine the inferences to be drawn therefrom. . . . Because the jury was able to comprehend the issues and evaluate the evidence, the expert's opinion, which intruded on the province of the jury to draw inferences and conclusions from that evidence, was improperly admitted.

*Id.* (citation omitted).

The State asserts the weight of out-of-state authority supports a more liberal approach regarding the admissibility of medical examiner opinions on cause or manner of death under rule 5.702. Iowa R. Evid. 5.702; *see, e.g., Baraka v. Commonwealth*, 194 S.W.3d 313, 314–16 (Ky. 2006) (holding the trial court did not abuse its discretion in admitting a medical examiner's opinion that the victim's manner of death was homicide when the medical examiner's opinion was "based, in part, on disputed information regarding the circumstances of the victim's death that was provided to her by police"); *Rollins v. State*, 897 A.2d 821, 849, 851–52 (Md. 2006) (holding a medical examiner's opinion that the victim was "smothered" was admissible when her opinion was based, in part, on witness statements and information provided by police), *abrogated on other grounds as recognized by Derr v. State*, 29 A.3d 533, 548–49 (Md. 2011); *Dao Xiong*, 829 N.W.2d at 397–98 (holding the trial court did not err in admitting a medical examiner's testimony that the victim's manner of death was "homicide" when the medical examiner's opinion "was based

on [his] examination of [the victim's] body"); *State v. Bradford*, 618 N.W.2d 782, 790, 793 (Minn. 2000) (holding a medical examiner's testimony that the victim's death was a "homicide" was admissible because the "testimony was helpful to the jury" and assisted it in "differentiat[ing] between a self-inflicted intraoral gunshot wound and one inflicted by another"); *State v. Wilson*, 248 P.3d 315, 323–25 (N.M. 2010) (holding the trial court did not abuse its discretion in admitting a medical expert's testimony that the victim's death was "consistent with smothering" when the expert "considered several sources of information when forming his opinion, including the medical record and the autopsy report, as well as Defendant's confession and the police report"), *overruled on other grounds by State v. Tollardo*, 275 P.3d 110, 121 (N.M. 2012); *State v. Commander*, 721 S.E.2d 413, 420 (S.C. 2011) ("Because the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge."); *State v. Boyer*, 741 N.W.2d 749, 757 (S.D. 2007) (holding a forensic pathologist's testimony that the victim's manner of death was "homicide" was admissible when his conclusion was "based on [his] interview with the law enforcement officers that were investigating the death and . . . the autopsy findings"); *State v. Richardson*, 603 A.2d 378, 379 (Vt. 1992) (holding, in a case where the defendant did not raise a rule 702 argument, a medical examiner's testimony that the victim's death was a "homicide" did not impermissibly state a legal conclusion concerning the defendant's guilt because the jury "still had to decide the ultimate question of whether defendant was at all involved in the homicide"); *State v. Scott*, 522 S.E.2d 626, 632 (W. Va. 1999) (holding, in a case where the defendant did not raise a rule 702 argument, a medical examiner's testimony that the

victim's death was a "homicide" did not impermissibly state a legal conclusion concerning the defendant's guilt). However, unlike the cases discussed above, in many of the cases cited by the State the medical experts based their opinions primarily on the autopsy results, as opposed to witness statements or other information provided by police.

For example, in *Dao Xiong*, the Supreme Court of Minnesota approved the admission of a medical examiner's testimony that the manner of death of a victim of a gunshot wound to the abdomen was homicide. 829 N.W.2d at 394–95, 98. In concluding the testimony would assist the jury, the court noted that the medical examiner based his opinion on his "examination of [the victim's] body."[8] *Id.* at 397.

---

[8]The extent to which the medical examiner in *Dao Xiong* relied on witness statements or information provided by police in forming his opinion on manner of death is somewhat unclear. However, in approving the medical examiner's testimony, the *Dao Xiong* court compared the case to its earlier *Bradford* decision in which the medical examiner based his manner-of-death opinion primarily on his examination of the victim's body. *See Dao Xiong*, 829 N.W.2d at 397 ("[I]n . . . *Bradford*, we concluded that no error was committed when the district court admitted a medical examiner's expert testimony that, based on his autopsy of the victim's body, the victim's manner of death was homicide rather than suicide."). This suggests the medical examiner in *Dao Xiong* based his opinion largely on his examination of the victim's body.

The court further noted that *Dao Xiong* was unlike its prior decision *Hestad v. Pennsylvania Life Insurance Co.*, 204 N.W.2d 433, 436 (Minn. 1973). *See Dao Xiong*, 829 N.W.2d at 397. There, the trial court excluded testimony from a coroner who would have testified on behalf of the defendant that an individual's cause of death was carbon monoxide poisoning and manner of death was accident, as opposed to suicide. *Hestad*, 204 N.W.2d at 435. In concluding the coroner's opinion was inadmissible, the Minnesota Supreme Court noted the coroner based his opinion largely "on information received from the sheriff." *Id.* at 436. As a result, "the medical expert did not . . . possess[] any peculiar knowledge or ability to assist the jury in the determination of whether the death was accidental or suicide." *Id.* Thus, the *Dao Xiong* court's effort to distinguish *Hestad* further suggests the medical examiner in *Dao Xiong* based his opinion largely on his examination of the victim's body.

The *Dao Xiong* court did note that subsequent decisions of the court "establish[ing] that expert testimony regarding the victim's manner of death can be helpful to the jury" have somewhat limited the scope of *Hestad*'s holding. *Dao Xiong*, 829 N.W.2d at 397. However, the court did not overrule *Hestad* or hold medical examiners may testify to cause or manner of death irrespective of the extent to which they base such opinions on witness statements or information provided by police. *Id.*

*Bradford* similarly involved a medical examiner's opinion that appears to have been primarily based on the autopsy.[9] *See* 618 N.W.2d at 790; *see also Sosnowicz*, 270 P.3d at 923 ("*Bradford*, however, is inapposite because the pathologist's opinion . . . appears to have been based on his external and internal examination of the victim rather than a history provided to him by law enforcement investigators."); *Dao Xiong*, 829 N.W.2d at 397 ("[I]n . . . *Bradford*, we concluded that no error was committed when the district court admitted a medical examiner's expert testimony that, *based on his autopsy of the victim's body*, the victim's manner of death was homicide rather than suicide." (emphasis added)). Likewise, the expert in *Rollins* relied largely on the autopsy in concluding the victim's cause of death was "asphyxiation" and manner of death was "smothering."[10] *See* 897 A.2d at 849–50.

---

[9]The *Bradford* court described the basis of the medical examiner's opinion as follows:

> The medical examiner who performed an autopsy on [the victim's] body noted a single intraoral gunshot wound with an exit wound on the back of her neck. The examiner concluded that [the victim] died from the gunshot wound. He also observed numerous bruises on [the victim's] scalp, left eye, ear, face, abdomen, hands, feet, arms, and legs and abrasions on her left eye, back, shoulders, buttocks, and knees. The examiner concluded that the injury to [the victim's] left eye was consistent with her having been struck with a fist.

618 N.W.2d at 790.

[10]The expert in *Rollins* did not base her opinion primarily on witness statements or information provided by police, but also relied on evidence of physical injuries on the victim indicating there had been an altercation and other physical findings consistent with smothering. *See* 897 A.2d at 848. Specifically, she noted:

> There was a hemorrhage in her mouth where it shouldn't be, indicating pressure on the mouth, hemorrhage, bleeding. That is indicative of smothering, pressure to the mouth in some manner from an external force, be it a hand, be it a pillow, something pushing on her mouth. . . .
>
> In addition, there are other injuries on her that you can't ignore also. They might not be part of the exact smothering but it is part of the injury that you have to take into consideration. Of course smothering is holding something over the mouth. Just because I have bruises on my

In *Baraka*, a fight between the defendant and the victim allegedly caused the victim to have a fatal heart attack. 194 S.W.3d at 314. A medical examiner testified the victim's cause of death was heart attack and manner of death was "homicide." *Id.* The defendant asserted the medical examiner's testimony regarding manner of death did not assist the jury because it was "based, in part, on disputed information regarding the circumstances of the victim's death that was provided to her by police." *Id.* In concluding the testimony was admissible, the Supreme Court of Kentucky observed that "it is axiomatic that a determination of the cause and manner which led to a person's death is generally scientific in origin and outside the common knowledge of layperson jurors." *Id.* Accordingly, the court concluded the testimony, based in part on information provided by police, assisted the jury. *Id.*

Three of seven justices concurred. *Id.* at 320 (Cooper, J., concurring). In summarizing the state of the law concerning medical examiner opinions on manner of death, the concurrence noted,

> [M]ost jurisdictions that have addressed the issue hold that a qualified expert can express an opinion that the manner of a disputed death was homicide, *i.e.,* that the death of one person was due to an act or omission of another, as opposed to natural causes or suicide, though not that the homicide was intentional, wanton, reckless, or accidental, which would constitute an opinion as to the guilt or innocence of the defendant.

*Id.* at 318. However, the concurrence also noted,

---

arms doesn't mean that I'm smothered. But she does have bruises on her arms as I stated. So she has additional injuries.

*Id.*

The expert also relied on witness statements and other information provided by police, namely that the house in which the incident occurred was recently ransacked; however, she expressly noted her physical findings indicated asphyxiation and smothering. *Id.* at 849.

The consensus of these cases is that an expert medical examiner or forensic pathologist can express an opinion not only as to the cause of death, but also that the manner of death was homicide . . . where such would not be readily ascertainable by a layperson, thus would assist that trier of fact in determining a fact in issue. However, the expert cannot express an opinion as to the mental state of the accused which would constitute an expression as to guilt or innocence, *and cannot base the opinion solely on facts that are just as easily understood by a layperson.*

*Id.* at 319 (emphasis added).

Two of seven justices dissented. *Id.* at 324 (Johnstone, J., dissenting). The dissent concluded the medical examiner exceeded the scope of her expertise and that her testimony did not assist the jury. *Id.* at 321. The dissent explained,

The jury did not require expert testimony to determine whether the altercation between [the victim] and [the defendant] was highly emotional; testimony from the investigating officers and the 911 recording would have been sufficient evidence upon which the jury could base an informed decision. Likewise, [the medical examiner's] expert opinion was unnecessary to an intelligent determination as to whether [the victim] did or did not perceive a physical threat that would induce stress. This question does not require specialized knowledge beyond the understanding of the average juror.

*Id.* at 321. Ultimately, five of seven justices agreed that, depending on the extent to which experts base their opinions on facts just as easily understood by laypersons, there is a point when such opinions do not assist the jury. The justices disagreed on when the line is crossed.

In *Boyer,* "[t]he issue . . . was whether [a nineteen-month-old victim's] injuries were either accidental from falling down the stairs or the subject of homicide from being thrown to the floor." 741 N.W.2d at 751–52, 756. A forensic pathologist testified the manner of death was homicide because the likelihood the victim's "injuries occurred as a result of falling down a flight of stairs was extremely small." *Id.* at 756–

57. While the pathologist in that case did base his opinion in part on information provided to him by police, there is no indication the information formed a substantial basis of his opinion. *See id.* at 757. Instead, the pathologist's opinion appears to have been primarily based on the fact that the victim's injuries were simply not consistent with an accident or suicide. *See id.* ("[T]he autopsy findings . . . suggested that natural disease certainly was not an option in this case nor was suicide an option in this case").

One of the State's strongest cases is *Commander.* 721 S.E.2d 413. There, a victim's "family members discovered [her] mummified and partially decomposed body covered by a blanket and lying on a sofa inside her home." *Id.* at 415 (footnote omitted). Despite the fact that "the autopsy did not uncover any evidence of violence or trauma to [the] [v]ictim's body," a medical examiner opined the cause of death was asphyxiation and the manner of death was homicide "due to the suspicious nature of [the] [v]ictim's death." *Id.* He based his opinion in part on anecdotal evidence provided to him by police concerning the scene of the incident, coupled with the absence of typical indicators of physical violence.[11] *Id.*

In concluding the medical examiner's opinion was admissible, the Supreme Court of South Carolina concluded that "[b]ecause the anecdotal history is an essential component of any autopsy, . . .

---

[11]In explaining the basis for his opinion, the medical examiner stated,

"I believe [the] [v]ictim died of unnatural causes. And as a result of elimination [of other manners of death], and like you mentioned, the interpolation of the facts of the case, that being her purse is gone, her car is gone, the house is locked up and somebody went through an awful lot of effort to cover up this death, that I feel that [the] v[ictim] died as a result of homicide due to asphyxiation."

*Commander,* 721 S.E.2d at 416 (third alteration in original) (footnote omitted).

testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge." *Id.* at 420. However, the court also acknowledged that "in certain circumstances, expert medical testimony of this type has the potential to invade the province of the jury" and distinguished the facts of the case from cases in which the expert "base[d] his opinion *exclusively* on the circumstantial information provided by the police officers at the scene." *Id.* at 420 & n.11.

Having surveyed the authority on the issue, we conclude there are circumstances when a medical examiner's opinions on cause or manner of death may assist the jury, even when such opinions are based in part on witness statements or information obtained through police investigation.[12] However, our review of the caselaw confirms there is no bright-line rule for determining whether a medical examiner may opine on cause or manner of death when his or her opinions are based, in whole or in part, on such information. Instead, whether a medical examiner's opinion on cause or manner of death is admissible depends on the particular circumstances of each case. For example, when a medical examiner bases his or her opinion of cause or manner of death largely on witness statements or information obtained through police investigation, such opinions would ordinarily be inadmissible under rule 5.702 because they would not assist the trier of fact. *See* Iowa R. Evid. 5.702; *see also, e.g., Sosnowicz*, 270 P.3d at 922; *Maxwell*, 414 S.E.2d at 473–74; *Perry*, 593 N.E.2d at 716; *Vining*, 645 A.2d at 20–21; *Jamerson*, 708 A.2d at 1195; *Eberle*, 697 N.Y.S.2d at 219; *Bond*, 311 S.E.2d at 771–

---

[12]We note that this case does not present an issue of whether an expert witness may rely on facts or data not in evidence under rule 5.703. *See* Iowa R. Evid. 5.703. Here, the facts and data relied on by Dr. Thompson were ultimately admitted into evidence. Thus, insofar as rule 5.703 is concerned, Dr. Thompson could rely on such information. *See id.*

72. In contrast, when a medical examiner bases his or her opinion on cause or manner of death primarily on the autopsy, such opinions will likely assist the jury in understanding the evidence and would ordinarily be admissible. *See* Iowa R. Evid. 5.702; *see also, e.g., Rollins*, 897 A.2d at 848–49, 851–52; *Dao Xiong*, 829 N.W.2d at 397–98; *Bradford*, 618 N.W.2d at 790, 793; *Boyer*, 741 N.W.2d at 757.

**D. Dr. Thompson's Testimony.** We turn now to consider whether it was appropriate for Dr. Thompson to opine on the cause and manner of Baby Tyler's death. First, we consider whether Dr. Thompson's opinions were sufficiently based on "scientific, technical, or other specialized knowledge" so as to "assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. Second, we consider whether under the unique facts of this case, Dr. Thompson's opinions amounted to an impermissible comment on Tyler's credibility. *See Dudley*, 856 N.W.2d at 676. We address each of these points in turn.

First, we conclude Dr. Thompson's opinions on the cause and manner of Baby Tyler's death were not sufficiently based on scientific, technical, or other specialized knowledge so as to assist the jury. Rather, Dr. Thompson admitted that his opinions on the cause and manner of Baby Tyler's death were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police, as opposed to objective medical findings. The central issue in this case was whether Baby Tyler was born alive and survived for a sufficient period of time for Tyler to drown him, or whether he was stillborn or died immediately after birth such that Tyler could not have drowned him. Without the benefit of objective medical findings, Dr. Thompson testified to the ultimate issues of fact questions for the jury to determine. Clearly, a medical

examiner could testify concerning the medical signs of drowning, whether the autopsy findings were consistent with drowning, whether there were other possible causes of death, whether he or she could rule out other possible causes of death, and whether he or she could legitimately render definitive opinions on cause or manner of death. Much of Dr. Thompson's testimony assisted the jury in these respects. However, the record in this case does not support the conclusion that Dr. Thompson relied on scientific, technical, or other specialized knowledge to classify the cause of Baby Tyler's death as bathtub drowning or the manner of his death as homicide, rather than undetermined. Instead, the record established Dr. Thompson's opinions were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police.

After performing the autopsy and pathology examination, Dr. Thompson's opinions on the cause and manner of Baby Tyler's death were undetermined. In his final report, however, Dr. Thompson concluded the cause of death was bathtub drowning and the manner of death was homicide. His final report clearly indicated that in forming his opinions he relied on Tyler's statements to police. His report stated: "The mother claimed she had given birth the previous day in the motel room and then placed the infant in a bathtub partially filled with water shortly after the birth. The baby reportedly moved and cried after birth." At the hearing on the motion in limine, Dr. Thompson agreed with defense counsel that based on the autopsy, he was unable to reach a conclusion on both the cause and manner of Baby Tyler's death. He admitted the *only* way he reached his final opinions was by reference to Tyler's statements to police during her interview at the police station.

At trial, Dr. Thompson testified on direct examination that there was nothing inconsistent with his autopsy findings and the State's theory that Baby Tyler was born alive and survived for a sufficient period for Tyler to drown him. Based on his physical examination of Baby Tyler's body, he ruled out several possible alternative causes of death. He further testified that there were indications Baby Tyler *may* have taken a breath because the alveoli in the lungs were partially, although not entirely, expanded. He then opined, "given the history that Baby Tyler cried and moved . . . Baby Tyler probably took a few breaths." He further opined the cause of death was drowning and the manner of death was homicide. On cross-examination, defense counsel pressed Dr. Thompson on the basis for his conclusions. Ultimately, Dr. Thompson testified there were several other possible causes of death he could not rule out based on the autopsy. He explained that partially expanded alveoli would also be consistent with the production of methane gas by bacteria found in the body after death, which "will diffuse up into the lungs and can expand those a[l]veolar spaces." He agreed with defense counsel that it was possible Baby Tyler died either in utero or immediately after birth. He then stated, "without the witness statements, I could not have diagnosed drowning in this case."

Thus, the record shows Dr. Thompson's opinions that the cause of death was drowning and manner of death was homicide were not based on scientific, technical, or other specialized knowledge. Iowa R. Evid. 5.702. Instead, the record shows that absent Tyler's statements, Dr. Thompson would have been unable to render definitive opinions on both cause of death and manner of death. Further, the record does not support the conclusion that Dr. Thompson relied on any other corroborating evidence, aside from Tyler's statements, in reaching his

opinions on cause or manner of death. Dr. Thompson did testify that his opinions were based on "a combination of history, which includes scene findings [and] witness statements," in addition to "[the] autopsy findings . . . and . . . supplemental testing." However, he did not explain how the scene findings or other objective information factored into his opinions. In fact, the record is devoid of any such objective evidence. Instead, he admitted Tyler's statements to police were the but-for factor in rendering his opinion. Consequently, Dr. Thompson's opinions on the cause and manner of death were not sufficiently based on scientific, technical, or other specialized knowledge as required by our rules. Iowa R. Evid. 5.702. He was in no better position to determine the cause or manner of death than were the members of the jury who watched and listened to Tyler's interviews with the special agents and had the opportunity to evaluate her credibility. His opinions on cause and manner of death did not assist the trier of fact and were therefore inadmissible under rule 5.702.

This case closely resembles cases from other jurisdictions in which courts have excluded medical examiner testimony for similar reasons. As discussed above, in those cases the medical examiner performed an autopsy, was unable to render an opinion on cause or manner of death, and then after review of witness statements or information obtained through police investigation, rendered an opinion based largely on that information. *See, e.g., Sosnowicz,* 270 P.3d at 922; *Maxwell,* 414 S.E.2d at 473–74; *Perry,* 593 N.E.2d at 714; *Vining,* 645 A.2d at 20–21; *Jamerson,* 708 A.2d at 1189–90, 1195; *Eberle,* 697 N.Y.S.2d at 219; *Bond,* 311 S.E.2d at 772. This is not a case where the medical examiner simply considered witness statements or information obtained from police, but based his or her opinions primarily on the physical evidence.

*See, e.g., Rollins*, 897 A.2d at 848–49, 851–52; *Dao Xiong*, 829 N.W.2d at 397–98; *Bradford*, 618 N.W.2d at 790, 793; *Boyer*, 741 N.W.2d at 757. Nor is it a case where the medical examiner relied on information fairly characterized as "anecdotal." *See, e.g., Commander*, 721 S.E.2d at 415. Instead, Dr. Thompson's opinions on the cause and manner of Baby Tyler's death were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police.

We also conclude that under the unique facts of this case, Dr. Thompson's opinions were inadmissible because they amounted to an impermissible comment on Tyler's credibility. As discussed above, an expert witness cannot comment, directly or indirectly, on a witness's credibility. *See Dudley*, 856 N.W.2d at 676–77. We prohibit such opinions because they "not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence." *Id.* We recently addressed the application of this rule in three child sex-abuse cases.

In *Dudley*, we held an expert who opined that a child victim's "physical manifestations and symptoms were consistent with a child dealing with and suffering from sexual abuse trauma" impermissibly commented on the child's credibility. *Id.* at 677–78. We reasoned that when an expert testifies that the child's physical manifestations or symptoms are consistent with sexual abuse trauma, "the expert is saying these symptoms mean the child suffered a sexual abuse trauma; therefore, the child must be telling the truth when he or she relates his or her story to the jury." *Id.* at 677. In *Dudley*, we also held another expert impermissibly commented on the child's credibility in communicating to the jury that she recommended the child receive therapy and stay away from the defendant. *Id.* at 678. Because she

based these recommendations on her belief that the defendant had sexually abused the victim as was related to her by the victim, we concluded the expert necessarily communicated to the jury that she believed the victim's story. *Id.* at 673, 678.

In *State v. Brown*, 856 N.W.2d 685, 688–89 (Iowa 2014), we held an expert impermissibly opined on a child victim's credibility when the expert's report stated the victim communicated to the expert that the defendant had inappropriately touched her and the expert believed " 'this disclosure [to be] significant and that an investigation [was] clearly warranted.' " We reasoned this final statement "indirectly convey[ed] to the jury that [the victim was] telling the truth about the alleged abuse because the authorities should conduct a further investigation into the matter." *Id.* at 689.

Finally, in *State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014), we held an expert crossed the line in testifying that a child victim's demeanor was " 'completely consistent with a child who has been traumatized, particularly multiple times.' " We concluded this testimony indirectly vouched for the child's credibility because the expert was in effect saying the child's "demeanor means the child suffered a sexual abuse trauma, therefore, the child must be telling the truth." *Id.*

An analogous situation occurred here. Tyler made various inconsistent statements to the special agents regarding whether Baby Tyler was born alive. During the ride from the trailer to the police station and for the first half of the three-hour interview at the police station, she told the special agents that after Baby Tyler was born he was silent, he did not move, and she immediately placed him in the garbage can. After the special agents interviewed her for over an hour and a half, Tyler then stated that after Baby Tyler was born he moved and cried and she placed

him in the bathtub and turned the water on for the purpose of drowning him. There is no additional objective evidence indicating Baby Tyler was born alive. Therefore, aside from Dr. Thompson's opinions, Tyler's statements to police were the only evidence presented to the jury showing whether Baby Tyler was born alive. Dr. Thompson's opinions that the cause of death was bathtub drowning and the manner of death was homicide were based primarily, if not exclusively, on Tyler's statements. Significantly, Dr. Thompson did not credit Tyler's initial statements to police that after Baby Tyler was born he was silent and did not move.[13] Instead, he selectively credited her statements during the second half of the interview when she stated Baby Tyler was born alive and described her actions after the birth. It is clear that if Tyler never stated Baby Tyler was born alive, Dr. Thompson could not have opined that the cause of death was drowning or that the manner of death was homicide. Thus, in opining on cause and manner of death, Dr. Thompson necessarily credited one version of Tyler's story over another. He at least indirectly communicated to the jury that he believed Tyler's statements when he stated on direct examination, "given the history that Baby Tyler cried and moved . . . Baby Tyler probably took a few breaths." As a result, Dr. Thompson's opinions on the cause and manner of death crossed that very thin line between testimony that assists the trier of fact and testimony that vouches for a witness's credibility.

Finally, for similar reasons, we have serious doubts as to whether Dr. Thompson possessed a reasonable degree of medical certainty with respect to his opinions on the cause and manner of Baby Tyler's death.

---

[13]In fairness to Dr. Thompson, police may not have provided him with the audio recording of the ride from the trailer to the police station in which Tyler stated Baby Tyler did not cry or move after the birth.

Again, the record showed that after conducting the autopsy, Dr. Thompson was unable to reach an opinion on cause or manner of death. He then watched Tyler's interview with police and changed his opinion. By his own admission, he was only able to determine to a reasonable degree of forensic or medical certainty that Baby Tyler's cause and manner of death were undetermined. For all of these reasons, the district court abused its discretion in allowing Dr. Thompson to communicate his opinions concerning the cause and manner of Baby Tyler's death to the jury.[14]

**E. Summary.** In reaching the above conclusion, we do not create a bright-line rule to govern every criminal case in which a medical examiner is called to testify to a victim's cause or manner of death. Nor do we conclude medical examiners may never rely in part on witness statements or information obtained from police in forming their opinions. In this case, however, Dr. Thompson conceded he was unable to form an opinion on the cause or manner of Baby Tyler's death based on the autopsy and his investigation. Instead, he based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police. Without her statements, crediting some and discounting

---

[14]"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." Iowa R. Evid. 5.103. "In cases of nonconstitutional error, we start with the presumption that the substantial rights of the defendant have been affected. The State has the burden to affirmatively establish the substantial rights of the defendant were not affected." *Dudley*, 856 N.W.2d at 678 (citation omitted); *accord State v. Howard*, 825 N.W.2d 32, 41–42 (Iowa 2012). While the State makes a passing reference to harmless error in its brief, in context, it is clear the State is not arguing harmless error in this case. The State failed to cite any authority in support of this issue and did not argue this in its application for further review or at oral argument. Therefore, the State has waived the issue of harmless error on appeal. *See* Iowa R. App. P. 6.903(2)(*g*)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *Dudley*, 856 N.W.2d at 678 (finding the State waived a harmless-error argument by failing to raise it on appeal); *In re Det. of Blaise*, 830 N.W.2d 310, 320–21 (Iowa 2013) (acknowledging that the State waives a harmless-error argument by failing to raise it on appeal).

others, Dr. Thompson could not have offered an opinion on the critical issue in this case: whether Baby Tyler was born alive. His opinions were not sufficiently based on scientific, technical, or other specialized knowledge and therefore did not assist the trier of fact. Iowa R. Evid. 5.702. Further, under the unique facts of this case, Dr. Thompson indirectly vouched for Tyler's credibility. Because Dr. Thompson's opinions on these matters failed to comply with our evidentiary rules, we vacate the decision of the court of appeals, reverse the conviction, and remand the case for a new trial.

**IV. Other Issues on Appeal.**

Tyler raised other issues in this appeal. While not dispositive, these issues may form the basis for a subsequent appeal. Therefore, we elect to address them as part of this appeal. Specifically, we address whether the search of room 225 violated the Fourth Amendment to the United States Constitution and whether the special agents' various questionings of Tyler violated the Fifth and Fourteenth Amendments to the United States Constitution.[15]

**A. Search of the Hotel Room.** The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

---

[15]In district court, Tyler cited the Federal Constitution and the Iowa Constitution in both her motion to suppress evidence obtained during the search of room 225 and her motion to suppress her statements to the special agents. As it relates to both motions, Tyler did not make a specific argument based on the Iowa Constitution. Further, the district court's rulings on both of these motions were based entirely on the Federal Constitution. Tyler did not file a motion to enlarge the trial court's ruling. *See State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008). Thus, because Tyler's state constitutional claims were not sufficiently raised or ruled on by the district court, any such claims she has raised in this appeal were not adequately preserved. *See id.*; *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Accordingly, we consider Tyler's claims only under federal constitutional standards.

searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. In assessing whether a search resulted in a Fourth Amendment violation, we apply a two-step approach. *State v. Brooks*, 760 N.W.2d 197, 204 (Iowa 2009). "First, the defendant must show that he or she has a legitimate expectation of privacy in the area searched. 'Second, if the defendant had a legitimate expectation of privacy, we must then decide whether the State unreasonably invaded the protected interest.' " *Id.* (citations omitted) (quoting *State v. Halliburton*, 539 N.W.2d 339, 342 (Iowa 1995)).

1. *Expectation of privacy.* To establish a legitimate expectation of privacy in the area searched, "a defendant challenging a search must show (1) a subjective expectation of privacy and (2) this expectation of privacy was reasonable." *State v. Ortiz*, 618 N.W.2d 556, 559 (Iowa 2000); *accord State v. Lowe*, 812 N.W.2d 554, 567 (Iowa 2012). " 'The determination of whether a person has a legitimate expectation of privacy with respect to a certain area is made on a case-by-case basis, considering the unique facts of each particular situation.' " *State v. Fleming*, 790 N.W.2d 560, 564 (Iowa 2010) (quoting *State v. Breuer*, 577 N.W.2d 41, 46 (Iowa 1998)). Whether a defendant's expectation of privacy is reasonable "is determined by examining property laws as well as society's generally recognized and permitted expectations about privacy." *Id.* We first analyze whether Tyler has demonstrated a subjective expectation of privacy in room 225.

Tyler originally rented room 225 in the early morning hours of September 19. She paid for the room at that time. Based on the record, it is reasonable to conclude she was having contractions and was looking for a private location in anticipation of the birth of Baby Tyler. Tyler brought nothing with her for an overnight stay. Further, after giving

birth to Baby Tyler, Tyler left the room and returned to the trailer in Coalville where she stayed for the night. However, when Tyler returned to the hotel the next morning to check out, the hotel manager informed her that she could rent room 225 for an additional night. She did so and paid for the second night at that time. It is undisputed that at all times during this period, the room was registered to Tyler. Shortly thereafter, she left the hotel and returned to the trailer. Upon her departure, she left a "Do Not Disturb" sign hanging from the doorknob of room 225. *See United States v. Lanier*, 636 F.3d 228, 231 (6th Cir. 2011) (concluding a "Do Not Disturb" sign hanging from a hotel room's doorknob supported the conclusion that the defendant had a subjective expectation of privacy in his hotel room). She left her bloody hoodie coat, two vodka bottles, eight dollars, and Baby Tyler's body in the room. *See id.* (suggesting a defendant's decision to leave clothing and "a lot of cocaine" in his hotel room supported the conclusion that the defendant had a subjective expectation of privacy in his hotel room). The record further established that Tyler intended to return to the room later to clean up. Thus, while Tyler was not present when police entered the room, the record supports the conclusion that after she departed from the hotel on September 20, she maintained a subjective expectation of privacy in room 225.

Having concluded Tyler had a subjective expectation of privacy in room 225, we turn now to consider whether this expectation of privacy was one " 'that society is prepared to recognize as reasonable.' " *Fleming*, 790 N.W.2d at 565 (quoting *Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S. Ct. 1684, 1688, 109 L. Ed. 2d 85, 93 (1990)). The Fourth Amendment clearly establishes a reasonable expectation of privacy in the home. *Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379, 63 L. Ed. 2d 639, 650 (1980). "The case law extends this protection to hotel

or motel rooms." *Brooks*, 760 N.W.2d at 205; *accord Stoner v. California*, 376 U.S. 483, 486, 84 S. Ct. 889, 891, 11 L. Ed. 2d 856, 859 (1964); *Fleming*, 790 N.W.2d at 565; *State v. Smith*, 178 N.W.2d 329, 332 (Iowa 1970). However, as we have previously explained:

> The mere fact that a premise[s] may be characterized as a residence or a motel room does not, by itself, establish that a particular person has a reasonable expectation of privacy in the premises. For example, the use of a hotel or motel room as a center for drug transactions and not as a residence does not give rise to legitimate expectations of privacy within the ambit of the Fourth Amendment. A defendant does not have a reasonable expectation of privacy when the motel or hotel room is nothing more than "a convenient processing station" for the packaging and distribution of drugs.

*Brooks*, 760 N.W.2d at 205 (quoting *Minnesota v. Carter*, 525 U.S. 83, 102, 119 S. Ct. 469, 479, 142 L. Ed. 2d 373, 388 (1998) (Kennedy, J., concurring)).

Ultimately, a defendant must establish that he or she was using a hotel or motel room as a residence, or for some other purpose for which he or she had a legitimate expectation of privacy. *See Brooks*, 760 N.W.2d at 205. "A bald assertion that one has been staying in a hotel, without further proof, is generally insufficient; as is the defendant's mere presence in the motel room at the time of the search." *Id.* Whether the guest checked into and paid for the room is one factor we consider in assessing whether an individual had a reasonable expectation of privacy in the room. *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000); *United States v. Carter*, 854 F.2d 1102, 1105–06 (8th Cir. 1988). We also consider whether the room is rented to the defendant at the time of the search. *See United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992) ("A guest in a motel has no reasonable expectation of privacy in a room after the rental period has expired."); *United States v. Parizo*, 514

F.2d 52, 54 (2d Cir. 1975) ("[W]hen the term of a guest's occupancy of a room expires, the guest loses his exclusive right to privacy in the room."). Another relevant factor is "the presence of the defendant's belongings." *Brooks*, 760 N.W.2d at 205; *accord Cooper*, 203 F.3d at 1284.

We turn now to apply these principles to the unique facts of this case. We must decide, based upon the record developed, whether Tyler was using room 225 as an overnight guest, thereby giving rise to a reasonable expectation of privacy, or whether she was using the room for a purpose for which she had no reasonable expectation of privacy. Upon our de novo review of the record, we conclude Tyler's expectation of privacy in room 225 was reasonable. Tyler rented room 225 in her own name. She paid for the room on both September 19 and September 20. The room was rented to her at the time of the search. She brought personal property with her to the room, albeit a minimal amount. She placed a "Do Not Disturb" sign on the door indicating she expected privacy. As stated earlier, it is reasonable to assume she checked into the room believing she was about to give birth. These actions are consistent with her continuing efforts to conceal the pregnancy from her friends and family. The mere fact that she gave birth to a child in the room does not, alone, diminish her otherwise reasonable expectation of privacy in the room. On this record, we cannot conclude Tyler's sole purpose for renting room 225 was to commit a criminal offense. Considering the totality of the circumstances, Tyler had a reasonable expectation of privacy in room 225.

2. *Invasion of protected interest and the exclusionary rule.* " 'Warrantless searches are per se unreasonable if they do not fall within one of the well-recognized exceptions to the warrant requirement.' " *Lowe*, 812 N.W.2d at 568 (quoting *State v. Naujoks*, 637 N.W.2d 101, 107

(Iowa 2001)). Further, if a defendant had a legitimate expectation of privacy in the searched area, and the search does not fall within an exception to the warrant requirement, "[t]he exclusionary rule requires the suppression of evidence discovered as a result of [the] illegal government activity." *State v. McGrane,* 733 N.W.2d 671, 680 (Iowa 2007). "However, there are exceptions to the exclusionary rule." *Id.* at 681. There is no dispute that police initially entered room 225 without a warrant. Therefore, any analysis should include whether an exception to the warrant requirement or exclusionary rule applies in this case.

In its ruling on the motion to suppress evidence obtained by police during the search of room 225, the district court concluded Tyler did not have a reasonable expectation of privacy in the room because "as was the case in *Brooks*, the motel room was not intended to be used as a 'residence' but rather a venue for the commission of an alleged crime." As discussed above, the district court erred in denying Tyler's motion on that basis alone because the conclusion that Tyler rented room 225 for the sole purpose of committing a criminal offense is not supported by the record. Because of the district court's specific ruling on that issue, it did not address whether any exceptions to the warrant requirement or exclusionary rule may apply to law enforcement's search of room 225.

One potentially applicable exception to the warrant requirement in this case is the community caretaking exception. *See State v. Kern*, 831 N.W.2d 149, 172 (Iowa 2013). "A core notion of the community caretaking exception is that . . . it is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706, 715 (1973)). " 'The community caretaking function involves the duty of police officers to help citizens an

officer reasonably believes may be in need of assistance.' " *Id.* at 172–73 (quoting *State v. Mireles*, 991 P.2d 878, 880 (Idaho Ct. App. 1999)).

We have recognized that " 'the community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the "public servant" exception.' " *State v. Kurth*, 813 N.W.2d 270, 274 (Iowa 2012) (quoting *State v. Crawford*, 659 N.W.2d 537, 541 (Iowa 2003)). The emergency aid doctrine and the public servant exception are closely related. *Crawford*, 659 N.W.2d at 541. As we have previously recognized:

> Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring. . . . [I]n contrast, the officer in a public servant situation might or might not believe that there is a difficulty requiring his general assistance. For example, an officer assists a motorist with a flat tire under the public servant doctrine, but an officer providing first aid to a person slumped over the steering wheel with a bleeding gash on his head acts pursuant to the emergency aid doctrine.

*Id.* at 541–42 (alterations in original) (quoting Mary Elisabeth Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 333–34 (1999)).

The determination of whether the community caretaking exception applies

> require[s] a three-step analysis: (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Crawford*, 659 N.W.2d at 543; *accord Kern*, 831 N.W.2d at 173. While the test "does not primarily focus on searches," we have previously

applied the community caretaking exception to justify searches in several cases. *Kern*, 831 N.W.2d at 173 (collecting cases).

One potentially applicable exception to the exclusionary rule in this case is the inevitable discovery doctrine. *See McGrane*, 733 N.W.2d at 681. Under the inevitable discovery doctrine, "relevant, probative evidence gathered despite Fourth Amendment violations is not constitutionally excluded when the police would have inevitably discovered the same evidence acting properly." *State v. Christianson*, 627 N.W.2d 910, 912 (Iowa 2001).

Unfortunately, the State did not develop an adequate record on these issues in the district court. While it was error for the district court to conclude Tyler had no reasonable expectation of privacy in room 225, we will allow the State to develop an additional record on whether these or any other potential exceptions to the warrant requirement or exclusionary rule apply. On this record, we reverse the district court's denial of the motion to suppress and remand this issue for further hearing and ruling by the district court.

**B. Tyler's Statements to Police.** In *Miranda v. Arizona*, 384 U.S. 436, 471, 478–79, 86 S. Ct. 1602, 1626, 1630, 16 L. Ed. 2d 694, 722, 726 (1966), the Supreme Court of the United States required police to advise suspects of their rights under the Fifth Amendment to the United States Constitution before a custodial interrogation. The Court required that police tell the suspect

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726.

In determining the admissibility of a defendant's inculpatory statements over a Fifth Amendment challenge we apply a two-part test. *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997). "We first determine whether *Miranda* warnings were required and, if so, whether they were properly given. Second, we ascertain whether the statement is voluntary and satisfies due process." *Id.* *Miranda* warnings are only required if, at the time of police questioning, the suspect is both: 1) in custody, and 2) subject to interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S. Ct. 3138, 3144, 82 L. Ed. 2d 317, 328 (1984); *accord Countryman*, 572 N.W.2d at 557. Once police give a suspect the requisite warning, the "[s]uspect[] may waive [his or her] *Miranda* rights as long as the suspect has done so knowingly, intelligently, and voluntarily." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009). We turn now to address Tyler's specific arguments.

1. *Custodial interrogation.* Tyler asserts she was in custody when the special agents questioned her at the police station, prior to giving her *Miranda* warnings, in violation of her Fifth Amendment rights. For purposes of the Fifth Amendment, a suspect is in custody "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150, 82 L. Ed. 2d at 335 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275, 1279 (1983) (per curiam)). " '[A] court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there was 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." ' " *Countryman*, 572 N.W.2d at 557–58 (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528–29, 128 L. Ed. 2d 293, 298 (1994) (per curiam)). In deciding whether a suspect is in

custody at a given time, "we examine the extent of the restraints placed on the suspect during the interrogation in light of whether 'a reasonable man in the suspect's position would have understood his situation' to be one of <mark>custody.</mark>" *Ortiz*, 766 N.W.2d at 251 (quoting *Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151, 82 L. Ed. 2d at 336). We consider four factors in making this determination:

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning.

*Countryman*, 572 N.W.2d at 558. We turn now to determine whether Tyler was in custody at the Fort Dodge police station on September 20 when she stated she drowned Baby Tyler.

First, we must assess the language the officers used to summon Tyler. When the officers approached Tyler at the trailer, they did not demand that she go with them. They knocked on the door to the trailer, told her they needed to speak with her, and asked her if she needed medical attention. Tyler agreed to speak with them and said she did not need medical attention. Detective Chansler asked Tyler if she was "okay" with going with Special Agent Roehrkasse and speaking with the officers. Tyler responded, "Yea." Tyler was neither handcuffed nor forcibly placed in the back of Special Agent Roehrkasse's vehicle. *See State v. Miranda*, 672 N.W.2d 753, 760 (Iowa 2003) (considering the fact that the suspect was handcuffed as weighing in favor of custody). The record shows that Tyler voluntarily accompanied Special Agent Roehrkasse to the police station. *See State v. Smith*, 546 N.W.2d 916, 923 (Iowa 1996) ("Although coming to the center voluntarily is not alone enough to negate a finding of custody, it is indicative of the state of mind of a reasonable person in

the situation."); *State v. Brown,* 341 N.W.2d 10, 16 (Iowa 1983) ("He accompanied officers to the police station voluntarily and was at no time subjected to either physical or verbal restraint."); *see also Purvis v. Dugger,* 932 F.2d 1413, 1415, 1419 (11th Cir. 1991) (considering suspect's voluntary decision to accompany officers to the police station in a police vehicle as weighing against custody); *State v. Atkinson,* 670 A.2d 276, 285 (Conn. 1996) (considering a suspect's voluntary decision to accompany "two plainclothes detectives in an unmarked vehicle" to the police station as weighing against custody).  This factor weighs against custody.

Second, we must examine the purpose, place, and manner of the interrogation.  As we have previously recognized, while a three-hour interview may seem like a long time, this does not necessarily mean the suspect was in custody.  *See Countryman,* 572 N.W.2d at 558 ("The three-hour length of the conversation did not render it custodial."); *Brown,* 341 N.W.2d at 16 (finding no custody despite two and one-half hours of questioning).  Further, that an interview takes place at the police station does not, itself, render the suspect in custody.  *See Countryman,* 572 N.W.2d at 558 (finding no custody when interview occurred at the sheriff's office).  In examining the purpose, place, and manner of an interrogation, we examine factors including the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage. *See id*; *see also Smith,* 546 N.W.2d at 924.

Here, although the interrogation took place over the course of a three-hour period, the room in which it occurred was carpeted and well lit.  *See Smith,* 546 N.W.2d at 924 (considering building's furnishings in

assessing custody). Although the special agents who questioned Tyler were armed, they were dressed in plain clothes. *Id.* (finding the fact that officers were casually dressed weighed against custody). During the questioning, only two special agents were present at any given time. *See id.* (noting "[o]ne fact of particular significance is the number of law enforcement officers taking part in the interview process" and finding no custody when two officers conducted the interview). In fact, for the majority of the questioning only Special Agent Roehrkasse was present. *See id.* (considering the fact that only one officer was present for a majority of the questioning as weighing against custody). At the start of the interview, Special Agent Thiele asked Tyler if she needed to go to the restroom and told her that if she needed anything to drink, to let them know. The special agents again asked Tyler if she needed medical treatment. She responded, "No." The special agents did not engage in confrontational or aggressive questioning, but rather asked Tyler open-ended questions about the events that transpired at the hotel. *See Countryman*, 572 N.W.2d at 558 (finding nonconfrontational nature of questioning weighed against custody). During the course of the interview, the special agents did not raise their voices, but conducted themselves in a calm, respectful manner, often times prefacing questions with statements such as "[we] are not here to judge you." Finally, while "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time," *Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151, 82 L. Ed. 2d at 336, the record revealed the special agents were not attempting to get Tyler to confess to a crime. Rather, their discussion outside of Special Agent Roehrkasse's vehicle before transporting Tyler to the police station suggests they did not know what had happened at the hotel. Specifically, one of the officers stated,

"We don't know what we got." Thus, the purpose of the questioning was to ascertain what had happened, as opposed to getting Tyler to confess to a murder. Importantly, the special agents intentions manifested in the manner of their questioning, as they repeatedly informed Tyler that they were only trying to gather information. Their demeanor, tone, and line of questioning do not suggest a reasonable person would have understood him or herself to be in custody. This factor weighs against custody.

Third, we must examine the extent to which the special agents confronted Tyler with evidence of her guilt. Again, the record revealed that when the special agents began questioning Tyler they did not know whether Baby Tyler was born alive. While Special Agent Roehrkasse did ask Tyler if the autopsy would show that there had been air in the baby's lungs or that the baby was born alive, he did not suggest the autopsy would in fact show that Baby Tyler ever took a breath or was born alive. These questions were not accusatory in nature, but rather intended to encourage her to tell the truth. *See Smith*, 546 N.W.2d at 925 (finding officers decision to tell the defendants their stories did not match was a "tool with which to urge the defendants to provide more information," as opposed to an accusation of guilt). Prior to her confession, the special agents did not confront Tyler with any other evidence that she drowned Baby Tyler. This factor weighs against custody.

Finally, we must consider whether Tyler was free to leave the place of questioning. At the start of the interview, Special Agent Roehrkasse informed Tyler that, although she had ridden with him to the police station, she was free to leave at any time and that he would give her a ride back to Coalville if she desired. *See Miranda*, 672 N.W.2d at 760 (" 'The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of

freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.'" (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990))). Although the door to the interview room was closed, it was unlocked and Tyler's path to it was unobstructed. Special Agent Roehrkasse told Tyler that the fact that the door was shut should not deter her from leaving. During the interview, the special agents told Tyler she was free to leave one additional time. Immediately before the forty-three minute break, Special Agent Thiele reminded Tyler that the door was unlocked and informed her that she was free to "get up and roam around" if she wanted.

We recognize that Tyler had given birth the day before the interview and possibly remained under the stress of that event. Notwithstanding, the record revealed her physical state did not affect her ability to leave. Specifically, the afternoon of the birth Tyler drove herself from the hotel to the trailer and spent the night there. The following morning, she ate breakfast with Cyphers, ran errands, and returned to the hotel to check out. After renting room 225 for an additional night, she drove herself back to the trailer. Thus, Tyler's own conduct following Baby Tyler's birth undermines any claim that her medical condition precluded her from leaving the interview. Further, the special agents asked Tyler if she needed any medical attention prior to transporting her to the police station and several more times during the interview. Tyler coherently answered the special agents' questions and told them she did not need medical attention. We do not find that her medical state precluded her from leaving. This factor weighs against custody.

Upon our de novo review, we conclude Tyler was not in custody at any time prior to when she confessed to drowning Baby Tyler. Because

Tyler was not in custody when she initially confessed to drowning Baby Tyler, her initial confession was not obtained in violation of the Fifth Amendment.

2. *Waiver.* Tyler next argues that she did not execute a valid waiver of her *Miranda* rights at the police station before her confirmation confession or later at the hospital when she again admitted to drowning Baby Tyler. She maintains that she did not voluntarily waive her *Miranda* rights during these police encounters. In order to execute a valid waiver of one's *Miranda* rights, the waiver must be made "knowingly, intelligently, and voluntarily." *Ortiz,* 766 N.W.2d at 251. " '[V]oluntariness' for . . . due process purposes and *Miranda* purposes are identical." *Countryman,* 572 N.W.2d at 559. Therefore, "a *Miranda* waiver is involuntary only when it is shown to be the product of police misconduct or overreaching." *Id.* "For a waiver to be made voluntarily, the relinquishment of the right must have been voluntary, meaning it was the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." *Ortiz,* 766 N.W.2d at 251. The question of whether a suspect voluntarily waived his or her *Miranda* rights "is to be made by inquiring into the totality of the circumstances surrounding the interrogation, to ascertain whether the suspect in fact 'decided to forgo his rights to remain silent and to have the assistance of counsel.' " *Id.* (quoting *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S. Ct. 2560, 2571–72, 61 L. Ed. 2d 197, 212 (1979)). The State has the burden to prove by a preponderance of the evidence that Tyler voluntarily waived her *Miranda* rights. *Payton,* 481 N.W.2d at 328.

A number of factors are helpful in determining whether a defendant voluntarily waived their *Miranda* rights. These factors include:

> defendant's age; whether defendant had prior experience in the criminal justice system; whether defendant was under the influence of drugs; . . . whether defendant was mentally "subnormal"; whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used.

*Id.* at 328–29 (citations omitted). Further, while "[a] written waiver of constitutional rights is not alone sufficient to establish the waiver as . . . voluntary[,] [i]t is . . . strong proof of its validity." *Countryman*, 572 N.W.2d at 559 (citation omitted). We now turn to consider whether Tyler voluntarily waived her *Miranda* rights, both at the police station after Special Agent Roehrkasse informed her she was going to be charged, and the next day at the hospital during the special agents' follow-up questioning.

After Tyler initially confessed at the police station, Special Agent Roehrkasse took two breaks before telling Tyler she would be "charged today." He then read Tyler her *Miranda* rights aloud, and she signed a written waiver form. This is strong proof that Tyler executed a voluntary waiver. *Id.* Further, prior to reading Tyler her *Miranda* rights, Special Agent Roehrkasse asked Tyler if she was forced to make any of the statements she had previously made. She responded, "No." At the time of the questioning, Tyler was thirty-one years old. She had prior experience with the criminal justice system from a prior theft prosecution. She had graduated from high school and had taken several college courses. The record reflects that prior to the interview, Tyler had taken some cold medicine and felt "spacey" as a result. She also gave birth the day before the interview and was questioned for a long period. However, the record shows that the special agents took several breaks during the questioning and offered Tyler food, drink, and the opportunity

to use the bathroom. She was readily capable of understanding and answering the special agents' questions. Further, she voluntarily stayed at the police station and answered questions despite Special Agent Roehrkasse's offer to take her home. While on several occasions she began to cry, she never lost control or had a breakdown. The special agents never threatened Tyler, nor did they make any promises of leniency in exchange for her cooperation. Finally, the special agents did not engage in any deceptive tactics during the questioning. Tyler voluntarily answered the special agents' questions and then, after Special Agent Roehrkasse read Tyler her *Miranda* rights, she voluntarily waived her rights and confirmed her prior confession. Considering the totality of the circumstances, Tyler voluntarily waived her *Miranda* rights at the police station on September 20.

Many of the same factors also support the conclusion that Tyler voluntarily waived her *Miranda* rights at the hospital on September 21. Before this follow-up interview, Special Agent in Charge Hedlund again read Tyler her *Miranda* rights. Tyler explained what each of her rights meant to her, acknowledged that she understood her rights, and signed another written waiver form. Prior to this second interview, Tyler received a surgical repair for a tear from childbirth, she had lost a large amount of blood, her blood pressure was high, and she was taking several medications. Further, she initially told the officers she was "really out of it." However, she remembered speaking with Special Agent Roehrkasse the previous day and that his name was "Mike," knew she was at the hospital, never appeared confused, and was alert and tracking with the special agents' questions. *See Countryman,* 572 N.W.2d at 559 (finding a defendant's statements were voluntarily given despite the fact that the defendant was "under the influence of drugs and was confused"

because "she was easy to understand"); *State v. Edman*, 452 N.W.2d 169, 170 (Iowa 1990) ("Being 'under the influence' does not, standing alone, render inculpatory statements involuntary."). Additionally, when the special agents asked Tyler if she would prefer "[they] come back later," Tyler responded, "You can talk to me." Considering the totality of the circumstances, Tyler voluntarily waived her *Miranda* rights at the hospital on September 21.

3. *Voluntariness of confessions.* Finally, Tyler maintains that all of her confessions to the special agents were involuntary and therefore in violation of her due process rights under the Fourteenth Amendment to the United States Constitution. As noted above, " 'voluntariness' for . . . due process purposes and *Miranda* purposes are identical." *Countryman*, 572 N.W.2d at 559. Thus, the same factors outlined in the preceding subsection are relevant in determining whether Tyler's confessions were voluntarily given.

For many of the same reasons noted above, our de novo review of the record reveals that each of Tyler's confessions was voluntarily given. During the first interview, Special Agent Roehrkasse told Tyler that she was free to leave and that he would give her a ride home if she desired. The special agents asked her if she needed medical treatment. She responded, "No." While she had just given birth and had taken cold medicine, her own actions that morning suggest that she was capable of leaving if she desired. She voluntarily remained at the police station and answered questions. Her responses to the questioning clearly indicated she was capable of both understanding and answering the special agents' questions. The special agents made no threats or any promises of leniency in exchange for her cooperation. Neither did they engage in deceptive tactics. Tyler voluntarily answered the special agents'

questions, and then after being informed both that she would be "charged today" and of her *Miranda* rights, she told the special agents she had not been forced to confess previously. She then proceeded to confirm her initial confession.

At the hospital, although Tyler was tired, medicated, and had undergone surgery recently, she again agreed to speak with the special agents despite their offer to return later. She never appeared confused and was alert and tracked with the special agents' questions. While she had previously confessed, making it difficult for her to change her story, her prior confession was not the product of coercion. Although Special Agent Roehrkasse again participated in the follow-up interview, the interview took place at an entirely different location and a day later. The record does not reflect a woman whose will was overborne. Considering the totality of the circumstances, Tyler's confessions both at the police station and later at the hospital were voluntarily given and therefore not in violation of her due process rights.

Tyler was not in custody during her initial confession to the special agents at the police station. She voluntarily waived her *Miranda* rights both at the police station and later at the hospital. Each of her confessions was voluntarily given. The district court properly denied Tyler's motion to suppress her statements to police.

**V. Conclusion.**

The district court abused its discretion in allowing Dr. Thompson to opine on the cause and manner of Baby Tyler's death because he based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police as opposed to objective, scientific, or medical evidence. On retrial, should the State attempt to use Dr. Thompson as an expert witness, the district court should

prohibit him from testifying that the cause of death was "drowning" and the manner of death was "homicide." Likewise, it should redact the portions of the autopsy report stating his ultimate opinions on cause and manner of death.

With respect to Tyler's motion to suppress evidence obtained by police during the search of room 225, we conclude the district court erred in denying this motion based solely on the legal conclusion that Tyler had no reasonable expectation of privacy in room 225 because she obtained it for the purpose of committing a crime. We reverse this motion and remand the issue for further hearing and ruling by the district court concerning the applicability of exceptions to the warrant requirement or exclusionary rule. With respect to Tyler's motion to suppress statements made to police during her initial contact with law enforcement, at the police station, and at the hospital, we affirm the district court's ruling. We vacate the decision of the court of appeals, affirm the judgment of the district court in part and reverse in part, and remand the case for additional proceedings consistent with this opinion and a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

Hecht, J., files a concurrence in part and dissent in part in which Wiggins and Appel, JJ., join. Appel, J., files a concurrence in part and dissent in part in which Wiggins and Hecht, JJ., join. Waterman, J., files a concurrence in part and dissent in part in which Cady, C.J., and Mansfield, J., join.

**HECHT, Justice (concurring in part and dissenting in part).**

I agree the district court erred in allowing the medical examiner to rely primarily upon Tyler's uncorroborated statements in forming an opinion as to the cause of Baby Tyler's death. I also agree the district court erred in concluding Tyler had no reasonable expectation of privacy in the hotel room. However, I dissent in part because I conclude all of Tyler's statements to the police are inadmissible. The circumstances—especially the officers' repeated verbal assurances that Tyler was not in custody and their subsequent decision to administer warnings only after Tyler made all of the inculpatory statements they sought—demonstrate a calculated strategy to circumvent *Miranda*. In my view, the police questioning in this case constitutes a "midstream recitation of warnings after interrogation and unwarned confession" in violation of *Missouri v. Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601, 2605, 159 L. Ed. 2d 643, 650 (2004) (plurality opinion), and all of Tyler's statements made during the police station and hospital interrogations should have been suppressed.

Our court has not had occasion to apply *Seibert*. Thus, this case presents the first opportunity to consider the problem of midstream *Miranda* warnings in successive interrogations. *Seibert* was a split 4–1–4 decision, so courts applying it must determine whether the plurality opinion or Justice Kennedy's concurring opinion provides the controlling rule. *See Kuhne v. Commonwealth*, 733 S.E.2d 667, 673 (Va. Ct. App. 2012) ("The *Seibert* plurality would review *all* two-step interrogations under a multi-factor test . . . . Justice Kennedy's opinion would apply a form of heightened scrutiny only to those two-step cases in which law enforcement officers deliberately employed a two-step procedure designed

to weaken *Miranda*'s protections."). A majority of federal Circuit Courts of Appeals have adopted Justice Kennedy's standard, and so have several state courts. *See generally id.* at 672 & nn. 5–6 (collecting cases); *see also State v. Nightingale,* 58 A.3d 1057, 1066–67 (Me. 2012); *State v. Fleurie,* 968 A.2d 326, 332–33 (Vt. 2008).

I would not expressly adopt either standard in this case because I conclude the officers violated both. *See United States v. Aguilar,* 384 F.3d 520, 525 (8th Cir. 2004) (finding a *Miranda* violation under both the *Seibert* plurality opinion and Justice Kennedy's concurring opinion in the same case); *see also United States v. Pacheco-Lopez,* 531 F.3d 420, 427 n.11 (6th Cir. 2008) (same). The officers' strategy and technique in this case clearly exemplify the use of a "question-first tactic" that subverts *Miranda*'s rationale, *see Seibert,* 542 U.S. at 617, 124 S. Ct. at 2613, 159 L. Ed. 2d at 658, and epitomizes a "deliberate two-step strategy," *id.* at 622, 124 S. Ct. at 2616, 159 L. Ed. 2d at 661 (Kennedy, J., concurring in the judgment).

This case involves two successive interrogations: one beginning in the police car and continuing at the police station, and another at the hospital. Tyler received *Miranda* warnings toward the end of the three-hour police station interrogation only after she made incriminating statements regarding Baby Tyler's death. After receiving *Miranda* warnings at the police station, Tyler did not repeat her incriminating statements anew, but simply answered "Yes" as the officers confirmed what she had previously said.[16] She also received additional *Miranda*

---

[16]The transcript of the police station interview in the record fills sixty-eight pages. *Miranda* warnings precede only the final six pages, which span the final sixteen minutes of the three-hour interrogation. During that time, Tyler overwhelmingly provided one-word answers, likely because the officers asked almost exclusively yes-or-no questions—for example, "You gave birth at approximately 12:00 p.m., okay?"; "[Y]ou said you filled up the bathtub with approximately two to three inches of water?"; and

warnings at the hospital the next day where she repeated her incriminating statements.

## I. Custody Principles.

As a threshold matter, Tyler brings claims under both the Federal and State Constitutions. Because I conclude *Seibert* is dispositive, I would not reach the question whether the Iowa Constitution provides different standards. *Cf. State v. Kooima*, 833 N.W.2d 202, 212 (Iowa 2013) ("We do not decide this case under the Iowa Constitution because we resolve this issue based upon the Fourth Amendment of the United States Constitution.").

Custody for *Miranda* purposes is ordinarily an objective test that considers the totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293, 298 (1994) (per curiam). "[T]he ultimate inquiry is . . . whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275, 1279 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714, 719 (1977) (per curiam)). When making this inquiry, courts must keep in mind the purpose of the *Miranda* rule: to protect individuals from coerced or involuntary self-incrimination. *See Seibert*, 542 U.S. at 608, 124 S. Ct. at 2608, 159 L. Ed. 2d at 652–53 (plurality opinion); *Berkemer v. McCarty*, 468 U.S. 420, 433, 104 S. Ct. 3138, 3146–47, 82 L. Ed. 2d 317, 330 (1984).

_____

"[Y]ou brought the baby out of the tub and placed him in a trash can, correct?" In the few instances in which the officers did not ask a yes-or-no question, Tyler still answered very briefly. For example, to answer a question about where she gave birth, Tyler used just five words: "I was in the bathroom."

Our cases generally examine four factors in determining whether a suspect is in custody:

"(1) the language used to summon the individual;

(2) the purpose, place, and manner of interrogation;

(3) the extent to which the defendant is confronted with evidence of her guilt; and

(4) whether the defendant is free to leave the place of questioning."

*State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009) (quoting *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003)). These factors, however, are not exclusive, and no one fact or factor is determinative. *State v. Smith*, 546 N.W.2d 916, 922 (Iowa 1996) (en banc).

## II. Applying Custody Principles to This Case.

Recognizing their primary purpose was to obtain admissions of criminal conduct from the only suspect in their investigation, and understanding the circumstances surrounding the transaction had characteristics of interrogation raising *Miranda* implications, the officers told Tyler she was free to leave soon after she arrived at the police station and as the questioning began. They told Tyler she was free to leave because they knew a suspect's freedom to leave the interrogation room is a relevant factor in determining whether that suspect is in custody. *See Bogan*, 774 N.W.2d at 680; *State v. Ortiz*, 766 N.W.2d 244, 251–52 (Iowa 2009); *accord United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). But telling Tyler she was free to leave "is not 'talismanic' or sufficient in and of itself to show a lack of custody." *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010). Actions speak louder than words in this context, and several other factors convince me that Tyler was in custody from the time the officers took her from her residence and

should have received *Miranda* warnings before the questioning began. *See People v. Minjarez*, 81 P.3d 348, 357 (Colo. 2003) (en banc) (declining to credit officers' assurances the defendant was free to leave "when all external circumstances appear[ed] to the contrary"); *Buck v. State*, 956 A.2d 884, 908 (Md. Ct. Spec. App. 2008) (finding custody despite "what the detectives said about . . . not being under arrest and being free to leave," in part because the detectives used "catchphrases" in an effort "to create an interrogation that could be labeled non-custodial"); *see also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(d), at 737 n.57 (3d ed. 2007 & Supp. 2014) [hereinafter LaFave] (noting an assurance the suspect is free to leave "will not carry the day where it is, in effect, nullified by other police conduct").

First, Tyler did not voluntarily contact the police to offer a statement. *See Griffin*, 922 F.2d at 1351 ("[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist.").

Second, the words the three officers used when they arrived at Tyler's residence did not constitute a mere invitation for Tyler to come with them to the police station. Within fifteen seconds of Tyler opening the door, one officer told Tyler, "What we're going to do . . . I want to have you go with . . . this guy right here. OK. We need to get to the bottom of what's going on. OK." The officers discussed waking Cyphers, asking, "He knows what's going on?" Tyler responded that he did not. One officer stated, "May I ask you why not?" Tyler gave an inaudible response and the officer stated, "There's no way around this right now, he's going to know." Another officer stated, "We need to talk to him" and "We might as well get this over with." Thereafter, the officer told Tyler,

"why don't you ride with Mike," another officer. A DCI agent then directed Tyler to a police vehicle.

"If the so-called 'invitation' involves the person going to the station in the company of the police, then a finding of custody is much more likely." 2 LaFave § 6.6(d), at 735. Here, the words spoken at Tyler's residence communicated the notion that the officers *insisted* upon speaking with her at the police station about Baby Tyler. *See Bogan*, 774 N.W.2d at 680 (noting we consider "the language used to summon the individual" when determining whether a suspect was in custody); *Ortiz*, 766 N.W.2d at 251–52 (same); *State v. Werner*, 9 S.W.3d 590, 596 (Mo. 2000) (en banc) (finding custody when a detective "requested" that a suspect accompany him to the police station and did not tell the suspect he could refuse to do so).

Third, the questions posed to Tyler during the car ride to the police station and soon thereafter at the police station lasted more than three hours. While the duration of three hours certainly is not dispositive on the question whether Tyler was in custody, it is nonetheless a relevant consideration. *See United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (noting length of questioning is an important factor); *Bogan*, 774 N.W.2d at 680 (noting we consider "the purpose, place, *and manner* of interrogation" (emphasis added)); *see also Aguilar*, 384 F.3d at 527 (suppressing a confession in part because the "questioning was not brief"); *Payne v. State*, 854 N.E.2d 7, 15 (Ind. Ct. App. 2006) (finding a *Seibert* violation when pre-*Miranda* questioning lasted seven hours).

Fourth, the officers took numerous lengthy breaks during the questioning at the police station and, after each of them, refocused their questions or asked specific follow-up questions about Baby Tyler's death. They did not accept Tyler's explanation that Baby Tyler was stillborn.

These breaks in the action and accusatory follow-up questions were obviously in furtherance of the officers' strategy for eliciting admissions establishing Tyler's guilt on each of the elements of a first-degree murder charge prior to giving the *Miranda* warnings. *See Bogan*, 774 N.W.2d at 680 (noting we consider the extent to which a suspect is confronted with evidence of guilt).

To be sure, the lengthy prewarnings session at the police station cannot reasonably be characterized as merely gathering nonsubstantive background facts. *Compare State v. Lewis*, 326 P.3d 387, 398 (Kan. 2014) (finding no *Seibert* violation because "[t]he pre-warning interview lasted only 10 minutes with nothing of substance revealed"), *and State v. Juranek*, 844 N.W.2d 791, 803–04 (Neb. 2014) (finding no *Seibert* violation when the prewarnings questions "did not touch upon key points in the investigation"), *with Payne*, 854 N.E.2d at 15 (finding a *Seibert* violation because police "waited to advise [the defendant] of her *Miranda* warnings until she essentially had divulged her entire involvement"). Notably, it was not until after Tyler stated she placed Baby Tyler face down in a bathtub containing water that Agent Roehrkasse left the room and returned with a written *Miranda* waiver form.[17] He then thoroughly reviewed with Tyler each of the *Miranda* warnings before eliciting with leading questions all of the details of Tyler's confession that had previously been methodically extracted from her.

---

[17]Tyler had previously revealed that Baby Tyler cried briefly after he was born. I find it significant that the officer did not stop posing questions and administer the *Miranda* warnings at that point. Instead, the officer forged ahead with the interrogation and did not stop until Tyler had admitted she had placed the baby face down in water in the bathtub. *See Seibert*, 542 U.S. at 616, 124 S. Ct. at 2612, 159 L. Ed. 2d at 657 ("When the police were finished there was little, if anything, of incriminating potential left unsaid.").

Further, although Tyler was not informed of her arrest on the murder charge before she was taken from the police station to the hospital for medical attention, the record reveals a law enforcement officer was posted outside her hospital room while she was there. *See Griffin*, 922 F.2d at 1355 (concluding when a suspect was arrested at the end of an interview, the arrest was objective evidence weighing in favor of custody "from the inception of the encounter"); *Buck*, 956 A.2d at 908 (finding custody even though officers repeatedly told the defendant he was free to leave and did not formally arrest him until after they drove him back home). On these facts, I would conclude Tyler was not free to leave the police station and therefore was in custody.

My conclusion that Tyler was in custody at all times en route to the police station and during the three hours of interrogation conducted after they arrived there is strongly influenced by the circumstances surrounding her physical and mental health. The officers knew from the outset of the questioning that Tyler had given birth at a hotel without medical assistance—indeed, without assistance from anyone—during the previous forty-eight hours. Although Tyler denied a need for medical assistance when the officers inquired, the officers either knew or certainly should have known that she had received no medical care during or after the delivery, and she therefore needed it promptly. There was clearly no urgent need for the interrogation to occur before a physical examination and postnatal medical treatment. Yet, the agents decided to interrogate Tyler as a suspect in a crime first, knowing that she had gone through a very traumatic event the night before.

### III. The *Seibert* Standard.

Because I conclude Tyler was in custody during the entire time she was en route to the police station and during the interrogations

conducted there and at the hospital, I would apply *Seibert*. In *Seibert*, the Supreme Court's plurality opinion set forth a number

> of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615, 124 S. Ct. at 2612, 159 L. Ed. 2d at 657. The police interrogation in this case meets each of those factors. The first round of interrogation was extremely detailed and complete and, as I have noted, the officers did not stop to administer *Miranda* warnings at the first sign Tyler might be culpable—her admission that Baby Tyler cried. The two statements fully overlap; indeed, the officers simply repeated Tyler's statements back to her and asked for an acknowledgement that they were correct. As in *Seibert*, "[t]he warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment." *Id.* The same officers conducted both interrogations. Finally, the officers expressly referred to previous statements using phrases such as "you told me" and "you said." With every one of these factors satisfied, just as in *Seibert*, this interrogation "by any objective measure reveal[s] a police strategy . . . to undermine the *Miranda* warnings." *Id.* at 616, 124 S. Ct. at 2612, 159 L. Ed. 2d at 657.

Additionally, the officers took no curative measures once they finally administered warnings. *See id.* at 622, 124 S. Ct. at 2616, 159 L. Ed. 2d at 661 (Kennedy, J., concurring in the judgment) ("If the deliberate two-step strategy has been used, postwarning statements that

are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."). Only fifteen minutes passed between the prewarning statements and the first *Miranda* warning at the police station, leaving Tyler insufficient time "to distinguish the two contexts and appreciate that the interrogation ha[d] taken a new turn." *See id.*; *see also Aguilar*, 384 F.3d at 525 (suppressing a confession when the "two interrogations were not separated in time, occurred in the same interrogation room, and the same officers participated in the questioning"). *Compare Vasquez v. State*, 453 S.W.3d 555, 574–75 (Tex. App. 2015) (concluding officers did not undertake curative measures when they provided *Miranda* warnings after just a short bathroom break), *with United States v. Courtney*, 463 F.3d 333, 339 (5th Cir. 2006) (concluding a properly Mirandized confession made "more than one year" after an unwarned confession need not be suppressed).

Further, the officers interrogating Tyler did not augment the *Miranda* warning with an additional disclosure that her previous unwarned statements might be inadmissible against her. *See Seibert*, 542 U.S. at 622, 124 S. Ct. at 2616, 159 L. Ed. 2d at 661. Instead, after administering the *Miranda* warnings at the police station and at the hospital, the officers expressly brought to Tyler's attention and actively used the inculpatory statements she had made before the warnings. *See Martinez v. State*, 272 S.W.3d 615, 626–27 (Tex. Crim. App. 2008) (including abstention from reference to the prior statement among a list of nonexhaustive curative measures gleaned from the *Seibert* plurality and concurring opinions). Thus, no matter which opinion sets forth the controlling *Seibert* rule, the officers violated it and Tyler's statements should be suppressed.

**IV. Voluntariness.**

After watching the video of the police station interrogation in this case, I find Tyler's physical condition and her emotional state substantially augment the factors mentioned above in creating a custodial environment during all of the questioning. The video establishes beyond dispute that Tyler's depleted physical condition was accompanied and aggravated by utter emotional despondency. Notwithstanding her obvious physical and extreme emotional vulnerability, however, the officers forged ahead with more than three hours of interrogation. They stopped and took her to the hospital, where she underwent surgery and was treated for blood loss,[18] only after they were confident they had secured admissions supporting the essential elements of first-degree murder. Thus, under the circumstances presented here, I am persuaded that, apart from the *Seibert* issue, Tyler's depleted physical and emotional state rendered all of her statements to the officers involuntary. *See State v. Alspach*, 524 N.W.2d 665, 667 (Iowa 1994) ("A contention that a defendant's statements were taken in violation of his [or her] *Miranda* rights and a contention that the statements were not voluntary are separate issues.").

In determining whether statements are voluntary, we consider "[m]any factors," including "the defendant's physical and emotional condition." *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982). In this case, Tyler's depleted physical condition and despondent emotional condition carry significant weight. Several cases from other courts confirm that a highly vulnerable defendant's statements are more likely

---

[18]Tyler's repeated denials when asked at her residence and again at the police station whether she needed medical attention informs and confirms my overall assessment of how poorly she was functioning physically and emotionally during the interrogation.

to be involuntary, and I find them instructive here. *See, e.g., Effland v. People,* 240 P.3d 868, 878 (Colo. 2010) (en banc) (concluding statements were involuntary when the defendant was suffering from extreme depression and had recently attempted suicide, and the "officers were fully aware of [his] mental condition and the failed suicide attempt at the time of the interrogation"); *People v. Humphrey,* 132 P.3d 352, 362–63 (Colo. 2006) (affirming a trial court's determination that a detective's interrogation was coercive "given [the defendant]'s weak and vulnerable state"); *State v. Marshall,* 642 N.W.2d 48, 55–56 (Minn. Ct. App. 2002) (finding statements involuntary in part because the defendant "became so emotionally upset that she cried . . . and had difficulty breathing" and officers expressed concern about a need for medical assistance but did not cease questioning); *Xu v. State,* 100 S.W.3d 408, 414–15 (Tex. App. 2002) (suppressing statements made after a defendant accused of killing his wife had been at the police station for hours, "was intermittently crying and clutching [his wife]'s picture," and became "so distraught[] it took almost twenty minutes to calm him down").

## V.  The Hospital Interrogation.

Tyler's confession at the hospital did not cure the infirmity of the earlier police station confession and, in my view, should also be suppressed. The same officers conducted the serial interrogations less than twenty-four hours apart. The substance of the hospital interrogation reveals the officers' purpose was to have Tyler again repeat the inculpatory statements she made before she received the *Miranda* warnings. Both officers repeatedly referenced the previous day's conversations, asking Tyler if she remembered their names, if she remembered receiving *Miranda* warnings the day before, and even expressly referencing Tyler's previous statements with phrases such as

"At some point I think you said . . . ." Early in Iowa's history, this court concluded an invalid first confession rendered a second confession invalid even though ten months separated them. *State v. Chambers*, 39 Iowa 179, 183 (1874) ("[B]elieving the first confession admissible, the strong probability is that [the defendant] concluded a repetition could make the case no worse, and the last confession was made under the influence of the preceding one."). We reversed the defendant's conviction despite that long temporal divide between the interrogation sessions. *See id.* I would apply the same principle here where the sessions were separated by less than twenty-four hours.

## VI. Conclusion.

The interrogating officer in *Seibert* candidly admitted a strategy to "question first, then give the warnings." *Seibert*, 542 U.S. at 606, 124 S. Ct. at 2606, 159 L. Ed. 2d at 651 (plurality opinion). Although the interrogating officers in this case did not expressly acknowledge an identical strategy, their failure to do so cannot be dispositive.[19] *See id.* at 616 n.6, 124 S. Ct. at 2612 n.6, 159 L. Ed. 2d at 657 n.6 (recognizing that officers' subjective intent to delay *Miranda* warnings until after inculpatory statements are made will "rarely be . . . candidly admitted" and recommending a "focus . . . on facts apart from intent that show the question-first tactic at work"). If express acknowledgement of such a strategy were dispositive, *Seibert* would provide an implausibly narrow fact-specific rule and officers could avoid the mandate of *Miranda*

---

[19]Notwithstanding the absence of such an explicit admission by the officers in this case, their strategy of questioning Tyler first and warning her later is unmistakable on this record. Just prior to transporting Tyler to the police station, the officers are overheard conferring among themselves about the word choices they would use in questioning Tyler about whether Baby Tyler was born alive. They decided the interrogating officer driving Tyler to the station should not ask whether the baby was born alive, but whether it cried or moved.

without consequence as long as they did not admit their strategy. Rather, I agree with the Supreme Court's observation that it is "unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id.* at 614, 124 S. Ct. at 2611, 159 L. Ed. 2d at 656.

The same should be said in this case for obvious reasons. If police can cure *Miranda* violations by simply taking a break in the interrogation and giving the required warnings after securing a confession, law enforcement officers will always be powerfully encouraged to question first and warn later. As the plurality opinion explained in *Seibert*, that kind of strategy actively avoids fulfilling *Miranda*'s prophylactic objective:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on the suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.

*Id.* at 613, 124 S. Ct. at 2611, 159 L. Ed. 2d at 655–56 (footnote omitted). This quotation from *Seibert* succinctly explains why the question-first-warn-later approach utilized by the officers in interrogating Tyler does violence to the *Miranda* rule and should not be condoned here.

I respectfully dissent in part because I conclude Tyler was in custody at all times after she was taken from her residence. Her motion to suppress should have been granted because all of her statements to the officers in the car, at the police station, and at the hospital were the

product of a violation of the *Miranda* rule and because they were involuntarily made.

Wiggins and Appel, JJ., join this concurrence in part and dissent in part.

**APPEL, Justice (concurring in part and dissenting in part).**

I concur in the majority's resolution of the expert opinion issue and the search and seizure issue. I dissent in the court's treatment of issues surrounding the custodial interrogation of Tyler.

By a 4–3 margin, a majority of this court has concluded Tyler was not in custody during the ride to the police station and during her interview at the police station. For the reasons expressed by Justice Hecht, three justices, including myself, reach a different conclusion. A slight variation in the facts could well have led to a different result. Whether a person is in custody will turn on the facts of a particular case, but I trust it clear this court will not tolerate a two-step confession process in which law enforcement seeks to evade the requirements of *Miranda.*[20]

In light of its conclusion Tyler was not in custody, the majority does not reach the question of proper remedy in the event of unlawful successive interviews. While I agree with Justice Hecht's application of *Seibert* under federal law, I write separately to emphasize that in my view, when law enforcement improperly engages in a two-step interrogation to defeat *Miranda*, the Iowa Constitution requires any improperly obtained inculpatory statements be suppressed unless the state meets the "fruit of the poisonous tree" test of *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441, 454 (1963).

---

[20]I note Tyler did not claim a different test should be utilized for determining custody under the Iowa Constitution. *Cf. State v. Kittredge*, 97 A.3d 106, 111 (Me. 2014) (applying ten-factor test and noting the state bears the burden of proof of showing lack of custody).

While the United States Supreme Court in *Oregon v. Elstad* took a different approach, I find the dissents in that case much more persuasive than the majority opinion. *Compare* 470 U.S. 298, 307–08, 105 S. Ct. 1285, 1292–93, 84 L. Ed. 2d 222, 231 (1985) (majority opinion) (finding "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period"), *with id.* at 335, 105 S. Ct. at 1306–07, 84 L. Ed. 2d at 249 (Brennan, J., dissenting) ("The correct approach . . . is to presume that an admission or confession obtained in violation of *Miranda* taints a subsequent confession unless the prosecution can show that the taint is so attenuated as to justify admission of the subsequent confession."), *and id.* at 364–72, 105 S. Ct. at 1321–26, 84 L. Ed. 2d at 268–73 (Stevens, J., dissenting). As noted by Justice Brennan in *Elstad*, the linkage between the unlawful confession and subsequent post-*Miranda* confession will ordinarily be clearly established. *Id.* at 321–24, 105 S. Ct. at 1299–1301, 84 L. Ed. 2d at 240–42 (Brennan, J., dissenting). Further, under *Miranda*, there is a presumption that the product of unwarned custodial interrogation is coerced. *See id.* If so, *Wong Sun* provides the proper standard for admission of inculpatory statements made after unwarned statements. To hold otherwise is to remove the strength of *Miranda* and encourage law enforcement to engage in quasi-custodial interrogations in the hope that a confession may be extracted without allowing the suspect to have the usual *Miranda* warnings.

Further, history demonstrates the voluntariness test is extraordinarily difficult to apply and leads to inconsistent results. *See Dickerson v. United States*, 530 U.S. 428, 444, 120 S. Ct. 2326, 2336, 147 L. Ed. 2d 405, 420 (2000) (noting that the totality of the circumstances test for voluntariness "is more difficult . . . for law enforcement officers to conform to, and for courts to apply in a consistent manner"); Louis Michael Seidman, Brown *and* Miranda, 80 Calif. L. Rev. 673, 729–30 (1992) (describing Justice Frankfurter's unsuccessful attempt to put spine into voluntariness). Indeed, that is one of the reasons why the *Miranda* rule was adopted in the first place. While not perfect, I view *Miranda* as an important protection to help ensure interrogations are truly voluntary.

My views are consistent with decisions from a number of other state jurisdictions. For example, in *Commonwealth v. Smith*, the Supreme Judicial Court of Massachusetts rejected the *Elstad* approach. 593 N.E.2d 1288, 1295–96 (Mass. 1992). According to the *Smith* court, a statement obtained in violation of *Miranda* is presumed to be tainted. *Id.* at 1295. As stated in *Smith*:

> The presumption of taint was intended to deter law enforcement officials from circumventing the Miranda requirements by using the warnings strategically—first questioning the suspect without benefit of warnings, and then, having obtained an incriminating response or having otherwise benefitted from the coercive atmosphere, by giving the Miranda warnings and questioning the suspect again in order to obtain an admissible statement.

*Id.* at 1292. Further, the *Smith* court found, "This presumption [of taint] supports one of the purposes of the 'bright-line' Miranda rule: to avoid fact-bound inquiries into the voluntariness of confessions." *Id.* at 1295–96. As a result, the *Smith* court held the prosecution has the burden of

showing a break in the stream of events in order to gain admission of the subsequent incriminating statements. *Id.* at 1292, 1295.

Appellate courts in Hawaii, New York, Tennessee, and Vermont have reached a similar conclusion based on similar reasons. *See State v. Pebria*, 938 P.2d 1190, 1196 (Haw. Ct. App. 1997) (rejecting *Elstad* under Hawaii Bill of Rights); *People v. Bethea*, 493 N.E.2d 937, 938–39 (N.Y. 1986) (per curiam) (rejecting *Elstad* under state constitution); *State v. Smith*, 834 S.W.2d 915, 919 (Tenn. 1992) (adopting approach of Justice Brennan under state constitution); *State v. Barron*, 16 A.3d 620, 626–27 (Vt. 2011) (endorsing the "fruit of the poisonous tree" analysis under state constitution).

I agree with the approach of these state authorities. On the record, I would find there was no "break in the stream of events" sufficient to allow for the admission of subsequent interrogation under *Wong Sun*. *See Elstad*, 470 U.S. at 326, 345–46, 105 S. Ct. at 1302, 1312, 84 L. Ed. 2d at 243, 255 (Brennan, J., dissenting) (internal quotation marks omitted).

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.

**WATERMAN**, **Justice (concurring in part and dissenting in part).**

I respectfully concur in part IV and dissent from part III of the majority opinion. The majority correctly concludes the district court properly denied Tyler's motion to suppress her confessions that she drowned her baby in the bathtub. Yet, the majority erroneously concludes the district court abused its discretion by allowing the medical examiner to testify as to the cause and manner of death because he relied on the same voluntary confessions the jury was allowed to hear. Medical experts testifying in our courts routinely rely on patient histories. Medical examiners such as Dr. Thompson are no different. The medical examiner has a statutory duty to investigate and determine the cause and manner of the suspicious death of a child. Iowa Code § 331.802(2)(*a*) (2015). Why fault Dr. Thompson for considering the mother's own incriminating statements as to how she killed her baby?

The majority breaks from long-standing Iowa law liberally allowing expert testimony, including testimony based on witness statements or patient histories. The majority acknowledges that "we have been committed to a liberal view on the admissibility of expert testimony." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). Indeed, Iowa courts have been committed to a liberal standard for over seventy years. *See Grismore v. Consol. Prods. Co.*, 232 Iowa 328, 343, 5 N.W.2d 646, 655 (1942) ("The modern tendency of the courts everywhere is to take a more liberal and rational view respecting the admissibility and scope of [expert] testimony."); *see also Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 530–31 (Iowa 1999) (noting the "expansive scope" of expert testimony under Iowa R. Evid. 5.702). In my view, we should continue to trust our adversary system to expose weaknesses in an

expert's opinions and trust our juries to give appropriate weight to expert testimony in this case and generally. The majority's opinion will inevitably lead to the exclusion of a wide variety of expert opinion testimony based on witness accounts.

The majority opinion rests on a false premise—that Dr. Thompson based his opinion as to the cause (drowning) and manner (homicide) of death *solely* on Tyler's statements to the police. To the contrary, his testimony confirms he based his opinions on his autopsy findings, lab reports, and the physical evidence at the crime scene as well as Tyler's confession. Dr. Thompson conducted a thorough physical examination of the deceased infant and sent organs to three outside specialists for testing. Through his own investigation, he was able to rule out congenital defects, substance abuse, infections, and skeletal trauma as alternate causes of death. He explained what he relied on to determine the infant's cause of death was drowning:

> Q. Do you have an opinion as to a reasonable degree of medical certainty regarding the cause of death in this case? A. Yes, I do.
>
> Q. And what is it? A. The cause of death is drowning.
>
> Q. And what do you base your opinion on? A. My opinion is based on a combination of history, which includes scene findings, it includes witness statements; it's also based on a combination of physical exam, which is my autopsy findings; and then supplemental testing.
>
> Q. Supplemental testing, for example, when you sent certain organs to a specialist to examine; is that correct? A. Supplemental lab testing would be x-rays, microbiology, metabolic studies.
>
> Q. Okay. Toxicology? A. Toxicology.

Dr. Thompson also explained how he determined the manner of death was homicide:

Q. What is your opinion based on? A. Just like cause of death, my manner of death opinion is based on history, again, scene findings, witness statements; it's based on a physical exam, or the autopsy; and then supplemental lab testing.

Dr. Thompson's autopsy findings corroborated Tyler's confession that her baby was born alive, moved, cried, and took some breaths before being drowned in bathwater. Dr. Thompson testified that there was fluid that could be bathwater in the baby's lungs consistent with drowning. Secondly, he testified that the expanded alveoli in Baby Tyler's lungs indicate the infant was probably born alive:

Q. In this case, is there any evidence that this baby took a breath? A. There could be, yes.

Q. Explain that, please. A. When I looked under the microscope, the – there's a structure in the lungs called alveoli, which are a grape-like structure. Some of those structures were expanded, which could be consistent with Baby Tyler taking a few breaths.

. . . .

Q. Do you have an opinion to a reasonable degree of medical certainty as to what that [partially expanded alveoli] indicates to you? A. Given the history that Baby Tyler cried and moved, to me that suggests that Baby Tyler probably took a few breaths.

The majority recognizes that "in making these determinations [about cause and manner of death], medical examiners routinely rely on the circumstances that surround the death, as revealed by independent investigation, police investigation, *and eyewitness accounts*." (Emphasis added.) I agree. As Dr. Thompson testified:

Q. In your role as a medical examiner, how do these witness statements and your knowledge of the scene, how important is that in determining a diagnosis of manner and cause of death? A. Uh, it's vital.

Q. And explain that, please. A. Um, so I'm a physician first. Um, as I've been saying, my diagnosis, which we call cause of death, is based on history, physical

exam, and then supplemental lab testing. Um, if I just did the physical exam, I would miss a significant number of cause and manner of death. It would be similar to you going to your primary care physician, sitting down on his exam table and just having -- have him start listening to your lungs, looking in your ears, checking your eyes without him asking you what's wrong. I can't obviously ask my patients what's wrong with them, so I have to ask other people what's wrong. I have to ask police what's wrong. Sometimes witnesses will come forward and say what's wrong or what happened. So that part of my diagnosis or cause of death, the history, is absolutely essential.

. . . .

So in every single case that I do, it's always history, physical exam, and lab tests, just like when you go see your physician.

It is well established that physicians may rely on self-reported patient histories. *See, e.g., Walker v. Soo Line R.R.*, 208 F.3d 581, 586 (7th Cir. 2000) ("Medical professionals reasonably may be expected to rely on self-reported patient histories. Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work." (Citation omitted.)). This applies equally to medical examiners who must determine the cause and manner of death. *See Baraka v. Commonwealth*, 194 S.W.3d 313, 315 (Ky. 2006) ("Indeed, the facts and data in this case, information regarding the circumstances of the victim's death provided by investigating officers, is exactly the kind of information customarily relied upon in the day-to-day decisions attendant to a medical examiner's profession."); *Rollins v. State*, 897 A.2d 821, 851 (Md. 2006) ("[W]e disagree with [the] contention that [an expert] relied upon improper information to render her expert opinion. [The expert's] consideration of the medical examiner's file in its entirety was proper. She testified that a review of all aspects of the file, including the criminal investigation, was necessary to form her opinion and was the accepted practice in her field."), *abrogated on other grounds as recognized*

*by Derr v. State*, 29 A.3d 533, 549 (Md. 2011); *State v. Wilson*, 248 P.3d 315, 324–25 (N.M. 2010) (allowing a forensic pathologist to "consider evidence beyond the medical record" in forming his medical opinion), *overruled on other grounds by State v. Tollardo*, 275 P.3d 110, 121 (N.M. 2012); *State v. Commander*, 721 S.E.2d 413, 420 (S.C. 2011) ("Because the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge."); *State v. Boyer*, 741 N.W.2d 749, 757 (S.D. 2007) ("Although [the medical examiner] considered extrinsic information in reaching his opinion, he further explained that receiving extrinsic evidence was widely accepted in the medical field . . . ."); *State v. Tucker*, 96 P.3d 368, 371 (Utah Ct. App. 2004) ("[The expert] testified that medical examiners regularly rely upon investigative information when forming their opinions. This practice is also supported in case law throughout the United States that examines this issue.").

These courts agree that medical examiners may rely on disputed witness testimony, with cross-examination as the proper tool to explore weaknesses in the opinions. *See Walker*, 208 F.3d at 586 ("In situations in which a medical expert has relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination."); *Baraka*, 194 S.W.3d at 315 ("It has been long held that such underlying factual assumptions are properly left for scrutiny during cross-examination."); *Rollins*, 897 A.2d at 853 ("All experts . . . were subject to cross-examination about their findings; once the experts' opinions were admitted, it was within the province of the trier of fact to determine which expert should be believed."); *Wilson*, 248 P.3d at 325

("Defendant was free to persuade the jury that [the expert's] opinion relied too much on a questionable confession and not enough on hard science. The jury remained the ultimate arbiter of [the expert's] credibility, and it was free to reject his opinion and conclude that [the victim's] death was caused by natural causes.").

Dr. Thompson was vigorously cross-examined and conceded his autopsy findings could also be consistent with a stillborn child with amniotic fluid in the lungs and alveoli expanded by gases released after death. He acknowledged he was unable to determine the cause and manner of death until viewing Tyler's confession. These weaknesses go to the weight of his opinion testimony, not its admissibility. *See Williams v. Hedican,* 561 N.W.2d 817, 823 (Iowa 1997) (" ' "[A]n expert's lack of absolute certainty goes to the weight of this testimony, not to its admissibility." ' " (alteration in original) (quoting *State v. Buller,* 517 N.W.2d 711, 713 (Iowa 1994))); *Hutchison v. Am. Family Mut. Ins. Co.,* 514 N.W.2d 882, 888 (Iowa 1994) ("[W]e believe with the aid of vigorous cross examination, the jury is fully capable of detecting the most plausible explanation of events.").

The cases the majority relies on are distinguishable. In *People v. Eberle,* an appellate court held the trial court erred by denying the defendant's motions to suppress the statements relied on by the medical examiner. 697 N.Y.S.2d 218, 219–20 (App. Div. 1999). The medical examiner's opinion that an infant's death was "homicidal suffocation" rather than Sudden Infant Death Syndrome (SIDS) was based on the statements alone, not any "medical evidence." *Id.* at 219. The statements, obtained in violation of defendant's right to counsel, were the fruit of the poisonous tree. *Id.* at 219–20. The suppression remedy would be empty if the jury nevertheless heard the inadmissible

statements through the medical examiner. By contrast, the majority correctly holds Tyler's confessions were properly admitted into evidence. Dr. Thompson was entitled to rely on the same confessions the jury heard, in addition to the medical evidence (his autopsy findings) that corroborated Tyler's self-incriminating statements to police.

The majority relies on other cases that did not involve a medical examiner relying on the defendant's confession. In *State v. Vining*, the medical examiner testified that "none" of the physical evidence supported her opinion that the fatal head injury "was caused at the hands of another as opposed to an accidental fall." 645 A.2d 20, 21 n.1 (Me. 1994). Dr. Thompson, however, testified that his opinion was supported by the physical findings of his autopsy, lab tests, and physical evidence at the crime scene, as well as Tyler's confessions, and explained how the forensic evidence corroborated her history of the drowning death. In *Maxwell v. State*, the medical examiner was unable to determine the cause of death from his autopsy, and his opinion that the manner of death was homicide "was based entirely upon the circumstances surrounding Gina Maxwell's demise as related to him by a detective working on the case." 414 S.E.2d 470, 473–74 (Ga. 1992), *overruled on other grounds by Wall v. State*, 500 S.E.2d 904, 907 (Ga. 1998). The medical examiner "admitted that his opinion as to the manner of death '[was] based on things the jury could determine themselves.' " *Id.* at 474 (alteration in original). That is not so in this case. The jury needed expert medical testimony to explain the significance of the fluid found in the infant's lungs and the partially expanded alveoli. Nor does *State v. Jamerson* help the majority. 708 A.2d 1183 (N.J. 1998). The medical examiner in that case strayed outside his zone of medical competence by acting as an accident reconstructionist in determining the defendant

drove recklessly.  *See id.* at 1194–95.  By contrast, Dr. Thompson simply did what medical examiners are trained to do.

Other cases cited by the majority conclude the use of the word "homicide" implies criminal guilt or intent, and prohibit medical examiners from testifying on that basis.  *State v. Sosnowicz,* 270 P.3d 917, 922 (Ariz. Ct. App. 2012) ("[The expert]'s testimony that the victim died as the result of a 'homicide' went to the key issue in the case: Did defendant intentionally, knowingly or recklessly cause the victim's death by a criminal act or was the victim's death the result of a non-criminal accident?"); *People v. Perry,* 593 N.E.2d 712, 716 (Ill. App. Ct. 1992) ("In fact, it might be construed as prejudicial, since a layperson might equate the word homicide with murder."); *Eberle,* 697 N.Y.S.2d at 219 ("Moreover, the expert's statement that the infant died from 'homicidal' suffocation improperly states a conclusion regarding defendant's intent."); *Bond v. Commonwealth,* 311 S.E.2d 769, 771–72 (Va. 1984) (finding medical examiner impermissibly testified to an ultimate issue of fact—death by homicide).  These cases are inapposite because Dr. Thompson testified that "homicide," as used in his report, is a neutral medical term:

> Q. And in this case, did you form an opinion to a reasonable degree of medical certainty regarding manner of death?  A.  Yes, I did.
>
> Q. And what is your opinion?  A.  In the manner of death is homicide.
>
> Q. And what does that mean?  Homicide.  A. Homicide is a medical term. It's a neutral term.  It doesn't signify right or wrong.  It simply means death at the hands of another individual.

Such explanatory testimony is lacking in the foregoing cases relied upon by the majority.  Tyler does not challenge the jury instructions given in this case, which correctly set forth the elements of the crimes charged.

The district court properly allowed Dr. Thompson to testify regarding the medical definition of homicide.

The majority inaccurately refers to Tyler's confessions as "uncorroborated." To the contrary, the police investigation and Dr. Thompson's medical investigation corroborate key factual statements in her confessions. During Tyler's first police interview, she described giving birth while standing up, which is corroborated by a bruise noted in the autopsy on Baby Tyler's forehead where he hit the floor of the bathroom. The police found key physical evidence—the placenta and the scissors used to cut the exposed umbilical cord—exactly where Tyler said she put them. Most importantly, Dr. Thompson's autopsy findings of fluid in the infant's lungs and expanded alveoli corroborate her description of how she filled the tub with water and placed Baby Tyler, born alive, face down in the bathwater to drown. Dr. Thompson's medical evaluation of Baby Tyler corroborated Tyler's confession. *See State v. Polly*, 657 N.W.2d 462, 467 (Iowa 2003) (" 'Corroboration need not be strong nor need it go to the whole case so long as it confirms some material fact connecting the defendant with the crime.' " (quoting *State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994))).

Dr. Thompson did not merely parrot Tyler's confession to the jury; he considered her account in the context of his medical conclusions from the autopsy and lab tests. Dr. Thompson admittedly could not determine the cause and manner of death without Tyler's confession. That does not mean his opinion rests on her confession alone. As medical examiners routinely do, he relied on his autopsy findings, lab test results, and physical evidence as well as the history provided by the only person present at the time of the baby's death. I would not exclude

testimony of medical witnesses because they necessarily rely on the history provided by family members present at the time of death.

I disagree with the majority's conclusion that "Dr. Thompson's opinions were inadmissible because they amounted to an impermissible comment on Tyler's credibility." The majority relies on *State v. Dudley* in which we concluded the prosecution's expert improperly vouched for the credibility of the child sex-abuse victim, not the defendant. 856 N.W.2d 668, 676–77 (Iowa 2014). Such precedent is inapplicable to expert testimony relying in part on an adult defendant's voluntary confession to establish the factual cause and manner of death. None of our court's precedent that culminated in *Dudley* involved a defendant arguing the state's expert improperly vouched for the *defendant's* credibility. Tyler, who did not testify at trial, is complaining Dr. Thompson "vouched for" what *Tyler herself* told police. This is a far cry from *Dudley*, which involved a "he-said, she-said" swearing contest that turned on whether the jury believed Dudley (who denied abusing the victim), or the child victim (who said Dudley abused her). The state could gain an unfair advantage through expert testimony introduced to bolster the credibility of a victim testifying against the defendant. *See id.* That concern is not implicated when an expert relies on the defendant's own words as to what happened.[21]

Significantly, Dr. Thompson never commented on Tyler's credibility, state of mind, or guilt in the presence of the jury. He gave no opinion as to her motive or intent. He simply relied, in part, on her

---

[21]It is true Tyler initially denied her baby was born alive before confessing, twice, that it moved and cried and she drowned the infant in the bathwater. Yet, as the majority and district court correctly found, Tyler's confessions were voluntary. Why would she make up the story? There is no evidence Tyler was coerced or duped into confessing through a promise of leniency. Why preclude a medical expert from relying on confessions deemed reliable enough for the jury to hear?

confessions for determining the physical cause and manner of death. As the majority recognizes, the term "homicide" as used by medical examiners such as Dr. Thompson "expresses no opinion as to the criminality of the killing or the culpability of the killer." A medical examiner testifying that the manner of death is homicide is rendering a neutral medical opinion, one required by statute. *See* Iowa Code § 331.802(2)(*a*) ("[T]he county medical examiner shall conduct a preliminary investigation of the cause and manner of death, prepare a written report of the findings, . . . and submit a copy of the report to the county attorney."). For a killing to be a crime, the requisite intent must be present. *See id.* §§ 707.1–.5. Intent, and therefore guilt or innocence, is for the jury to determine.

Most courts agree the expert medical examiner only crosses the line by testifying to the intent or guilt of the defendant. *See Commander*, 721 S.E.2d at 420 ("Of the many courts in other jurisdictions that have considered where to draw the line in these cases, we tend to agree with those courts that have found that expert testimony addressing the state of mind or guilt of the accused is inadmissible."). Dr. Thompson did not cross this line. *See id.*; *Willis v. State*, 558 S.E.2d 393, 395 (Ga. 2002) ("Because this testimony did not improperly invade the province of the jury on the ultimate issue of whether the death was an intentional killing or an accident, the trial court did not err . . . ."); *Baraka*, 194 S.W.3d at 318 ("Accordingly, most jurisdictions . . . hold that a qualified expert can express an opinion that the manner of a disputed death was homicide, . . . though not that the homicide was intentional, wanton, reckless, or accidental, which would constitute an opinion as to the guilt or innocence of the defendant."); *Rollins*, 897 A.2d at 851–52 (discussing how all expert testimony is designed to bolster one view of the facts,

which does not invade the province of the jury); *State v. Dao Xiong*, 829 N.W.2d 391, 397 (Minn. 2013) ("Here, the district court properly admitted [the expert's] testimony that the manner of [the victim's] death was homicide. . . . [I]t did not constitute improper expert testimony regarding [the defendant's] intent. [The expert's] testimony assisted the jury's understanding of the medical evidence offered at trial by explaining that the autopsy results were consistent with homicide. . . . [The expert's] testimony as to [the victim's] manner of death was based on [the expert's] examination of [the victim's] body."); *State v. Bradford*, 618 N.W.2d 782, 793 (Minn. 2000) (holding an examiner could testify to homicide as a manner of death, but not offer an opinion regarding intent); *Boyer*, 741 N.W.2d at 758 ("We finally note that neither expert usurped the function of the jury by testifying that [the victim] actually died as a result of being shaken or thrown down. Nor did the experts opine whether they thought [the defendant] was guilty."); *Tucker*, 96 P.3d at 371 ("In light of [the expert's] testimony that intent was not a factor in classifying [the victim's] death, and that intent is a question for the jury, we see no error in the trial court's rulings."); *State v. Richardson*, 603 A.2d 378, 379 (Vt. 1992) ("The testimony [that the manner of death was homicide] was not a comment on defendant's guilt or innocence."); *State v. Scott*, 522 S.E.2d 626, 632 (W. Va. 1999) ("Because the term 'homicide' is neutral and pronounces no judgment, we do not find that [the expert] testifying that [the victim's] manner of death was homicide removed any defense available to [the defendant]. In fact, [the expert] testified that his opinion was not a legal conclusion—that he was neither trained nor qualified to render a legal conclusion concerning [the victim's] death."). I would follow these well-reasoned decisions. Medical examiners should be allowed to rely on witness accounts, including a defendant's

confession, in testifying the manner of death was homicide so long as they do not testify that the defendant is "guilty" or has criminal intent.

I fear today's majority opinion will have unintended consequences. Going forward, will an accident reconstructionist be allowed to give opinions based on witness statements? May a forensic accountant rely on a defendant's confession to embezzlement or consider deposition testimony to determine a spouse dissipated marital assets? May a human-factors expert rely on disputed testimony as to how an accident happened when opining on the efficacy of a warning or safety of a product design? May a hydrologist rely on disputed testimony or a party's admissions to determine the source of groundwater contamination? May medical witnesses continue to rely on patient histories? After today's decision, it appears such testimony could be excluded from evidence any time the expert admits his opinion depends on the witness's account of what happened. This is an unwarranted and ill-advised sea change in our heretofore liberal approach to the admissibility of expert testimony.

We have routinely allowed expert testimony based on witness testimony or statements. Is the expert thereby indirectly vouching that the witness is telling the truth? Do these cases remain good law? *See, e.g., In re Det. of Stenzel*, 827 N.W.2d 690, 702 (Iowa 2013) (concluding expert testimony based on an interview with defendant and defendant's criminal history was sufficient to show that defendant had "a mental abnormality and had serious difficulty controlling his behavior"); *Leaf*, 590 N.W.2d at 530 (affirming admissibility of expert's opinion on product defect that depended on plaintiff's recollection of events); *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 308 (Iowa 1998) (discussing how expert considered statements of a third party when determining if an invention

meets the nonobvious requirement of a patent); *Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 639–40 (Iowa 1997) (discussing how expert relied on a two-hour interview, case documentation, and a family member's journal detailing plaintiff's symptoms to support opinion that plaintiff suffered from obsessive compulsive disorder); *State ex rel. Leas in re O'Neal*, 303 N.W.2d 414, 417 (Iowa 1981) (permitting clinical psychologist acting as an expert witness to use psychological testing and interviews to determine that parents were psychologically unfit to care for a child).[22]  These are just a few of the cases that could have gone the other way, had the majority's opinion been the rule of law when they were decided.

The court of appeals concluded the error in admitting Dr. Thompson's testimony was not harmless.  Given Tyler's confession, I am not so sure.  Several decisions cited by the majority held it was harmless or nonprejudicial error to allow a medical examiner to testify that the death was a homicide.  *Sosnowicz*, 270 P.3d at 925–26; *Perry*, 593 N.E.2d at 717.  The dissent in *Dudley* concluded that the admission of the expert testimony in that case was harmless.  856 N.W.2d at 684–85 (Cady, C.J., dissenting).  I would trust our juries to give the expert testimony proper weight.

---

[22]Decisions of the court of appeals would likewise be called into question by the majority's decision.  *See, e.g.*, *State v. Gilmore*, No. 11–0858, 2012 WL 3589810, at *5–6 (Iowa Ct. App. Aug. 22, 2012) (allowing psychologist to consider defendant's interview to determine that defendant could form the specific intent to kill); *State v. Favara*, No. 02–1311, 2003 WL 21920959, at *1–2 (Iowa Ct. App. Aug. 13, 2003) (allowing sheriff's deputy to testify as an expert witness as to how he believed a burglary took place after he "investigated the crime scene, photographed and weighed the items, and conducted interviews"); *In re Det. of Rafferty*, No. 01–0397, 2002 WL 31113930, at *1 (Iowa Ct. App. Sept. 25, 2002) (concluding that expert could base his opinion that a person is a sexually violent predator and likely to reoffend on a clinical interview, official records, and actuarial assessment tools).

The district court, relying on our traditional liberal approach to the admissibility of expert testimony, correctly denied Tyler's motion to suppress Dr. Thompson's testimony and autopsy report stating the cause and manner of Baby Tyler's death. The district court properly equated Dr. Thompson's reliance on Tyler's confessions to "a physician relying on a patient's history in reaching a diagnosis." I would affirm Tyler's conviction.

Cady, C.J., and Mansfield, J., join this concurrence in part and dissent in part.